No. 22-1041

# United States Court of Appeals
# for the Fourth Circuit

INTERPROFESSION DU GRUYERE;
SYNDICAT INTERPROFESSIONNEL DU GRUYERE,
*Plaintiffs-Appellants*,

v.

U. S. DAIRY EXPORT COUNCIL; ATALANTA CORPORATION;
INTERCIBUS, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:20-cv-01174 (Hon. T.S. Ellis, III)

## RESPONSE BRIEF FOR APPELLEES

Nicole A. Saharsky
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

Brian G. Gilpin
Zachary R. Willenbrink
GODFREY & KAHN, S.C.
833 East Michigan Street,
 Suite 1800
Milwaukee, WI 53202
(414) 273-3500

Jennifer L. Gregor
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
(608) 257-3911

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1041__      Caption: __Interprofession du Gruyere v. U.S. Dairy Export Council__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__U.S. Dairy Export Council__
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☑YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

U.S. Dairy Export Council's publicly held members (or members whose parents are publicly held), whose stock or equity value could be affected by the outcome of the proceedings (although unlikely substantially) or whose claims the trade association is pursuing in a representative capacity, are listed on Schedule A hereto.

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Brian G. Gilpin                    Date:    June 21, 2022

Counsel for: U.S. Dairy Export Council

ii

**SCHEDULE A**
**TO DISCLOSURE STATEMENT OF U.S. DAIRY EXPORT COUNCIL**

Abbott Nutrition [Parent: Abbott Laboratories, NYSE: ABT]

Glanbia Nutritionals [Parent: Glanbia plc, LON:GLB]

Mead Johnson Nutrition Co. [Parent: Reckitt Benckiser Group PLC, OTCMKTS: RBGLY]

Olam Americas, Inc. [Parent: Olam International Ltd., SGX:O32]

Phibro Animal Health Corp. [NASDAQ:PAHC]

Saputo Cheese USA Inc. [Parent: Saputo Inc., TSE(CAN):SAP]

StoneX Group, Inc. [NASDAQ:SNEX]

YUM! Restaurants International Inc. [Parent: Yum Brands, Inc., NYSE:YUM]

Zoetis Inc. [NYSE: ZTS]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  22-1041          Caption:  Interprofession du Gruyere v. U.S. Dairy Export Council

Pursuant to FRAP 26.1 and Local Rule 26.1,

Atalanta Corporation
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                           ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                            ☐YES ☑NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Brian G. Gilpin      Date: June 21, 2022

Counsel for: Atalanta Corporation

v

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _22-1041_     Caption: _Interprofession du Gruyere v. U.S. Dairy Export Council_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Intercibus Inc._
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Brian G. Gilpin                          Date:      June 21, 2022

Counsel for: Intercibus Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................... 1

STATEMENT OF THE ISSUE ...................................................... 4

STATEMENT OF THE CASE......................................................... 4

    A.    Legal Background ........................................................ 4

    B.    Factual Background...................................................... 7

        1.    Gruyere production around the world and sales of non-Swiss, non-French gruyere in the United States ....................................................... 7

        2.    The European Consortiums' efforts to protect the word "gruyere" ............................................... 11

    C.    Procedural History...................................................... 14

        1.    The European Consortiums' trademark applications........................................................ 14

        2.    The TTAB's decision ............................................. 16

        3.    The district court's decision.................................... 18

SUMMARY OF ARGUMENT ....................................................... 21

ARGUMENT .......................................................................... 26

THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO THE U.S. DAIRY GROUPS BECAUSE THE TERM "GRUYERE" IS GENERIC .................... 26

    A.    The District Court Applied The Settled Summary Judgment Standard And Settled Trademark Law To Undisputed Facts........................................................ 26

        1.    The district court applied settled law to the facts here............................................................ 27

        2.    The district court did not exceed its permissible role on summary judgment............... 30

## TABLE OF CONTENTS
### (continued)

**Page**

B. The Record Evidence Overwhelmingly Establishes That The Term "Gruyere" Is Generic ............................. 33

    1. Imported gruyere not from Switzerland or France ................................................................. 35

    2. American-made gruyere ....................................... 39

    3. U.S. food labeling standards................................. 43

    4. Common usage...................................................... 47

    5. Other evidence of genericness ............................. 50

C. The District Court Was Not Required To Rely On A Consumer Survey Or Use Magic Words To Find Genericness ................................................................. 52

    1. A consumer survey is not required to find genericness........................................................... 52

    2. No magic words are required to find genericness........................................................... 55

D. Summary Judgment Is Appropriate Because No Genuine Issue Of Material Fact Exists On Genericness ................................................................. 56

CONCLUSION............................................................................ 60

STATEMENT REGARDING ORAL ARGUMENT ....................... 61

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Online, Inc. v. AT & T Corp.,*
   243 F.3d 812 (4th Cir. 2001) ...............................................29, 56

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ...................................................... 27

*BellSouth Corp. v. DataNational Corp.,*
   60 F.3d 1565 (Fed. Cir. 1995)..................................... 52

*Belmora LLC v. Bayer Consumer Care AG,*
   987 F.3d 284 (4th Cir. 2021) ..................................... 18

*Booking.com B.V. v. PTO,*
   915 F.3d 171 (4th Cir. 2020) ...............................................26, 50

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ...................................................... 27

*Colt Def. LLC v. Bushmaster Firearms, Inc.,*
   486 F.3d 701 (1st Cir. 2007)...............................................37, 53

*Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc.,*
   690 F. Supp. 1457 (D. Md. 1988)............................... 53

*Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc.,*
   No. 88-1321, 870 F.2d 654, 1989 WL 21392 (4th Cir. 1989) .... 29

*In re Cooperativa Produttori Latte E Fontina Valle D'Aosta,*
   1986 WL 83578 (TTAB Mar. 19, 1986) .................................... 53

*In re Cordua Restaurants, Inc.,*
   823 F.3d 594 (Fed. Cir. 2016).......................................33, 50, 53

*Dennis v. Columbia Colleton Med. Ctr., Inc.,*
   290 F.3d 639 (4th Cir. 2002) ................................... 27

*Dulaney v. Packaging Corp. of Am.,*
   673 F.3d 323 (4th Cir. 2012) ................................... 27

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                             **Page(s)**

*George & Co. LLC v. Imagination Ent. Ltd.*,
   575 F.3d 383 (4th Cir. 2009) ................................................... 42

*Gimix, Inc. v. JS&A Grp., Inc.*,
   No. 80C6592, 1982 WL 52164 (N.D. Ill. Jan. 13, 1982) ........... 53

*Glover v. Ampak, Inc.*,
   74 F.3d 57 (4th Cir. 1996) ................................................*passim*

*Hickory Farms, Inc. v. Snackmasters, Inc.*,
   509 F. Supp. 2d 716 (N.D. Ill. 2007) ....................................... 53

*In re Hikari Sales USA, Inc.*,
   Serial No. 86439012, 2019 WL 1453259
   (TTAB Mar. 29, 2019) .............................................................. 53

*Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*,
   240 F.3d 251 (4th Cir. 2001) ........................................52, 54, 56

*Institut Nat'l Des Appellations D'Origine v. Vintners Intern. Co.*,
   958 F.2d 1574 (Fed. Cir. 1992).................................................. 44

*Luxco, Inc. v. Consejo Regulador Del Tequila A.C.*,
   Opp. No. 91190827, 2017 WL 542344
   (TTAB Jan. 30, 2017) ....................................................44, 46, 53

*Midwest Plastic Fabricators, Inc. v. Underwriters Labs. Inc.*,
   906 F.2d 1568 (Fed. Cir. 1990)................................................ 6, 7

*Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*,
   685 F.3d 1046 (Fed. Cir. 2012)................................................. 54

*Nartron Corp. v. STMicroelectronics, Inc.*,
   305 F.3d 397 (6th Cir. 2002) ................................................... 53

*Nemphos v. Nestle Waters N. Am., Inc.*,
   775 F.3d 616 (4th Cir. 2015) ........................................43, 44, 46

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                            **Page(s)**

*POM Wonderful LLC v. Coca-Cola Co.*,
   573 U.S. 102 (2014) ................................................................ 45

*PTO v. Booking.com B.V.*,
   140 S. Ct. 2298 (2020) ........................................................5, 6, 28

*Retail Servs., Inc. v. Freebies Publ'g*,
   364 F.3d 535 (4th Cir. 2004) .............................................*passim*

*Royal Crown Co., Inc. v. The Coca-Cola Co.*,
   892 F.3d 1358 (Fed Cir. 2018)......................................29, 42, 53

*Shammas v. Focarino*,
   784 F.3d 219 (4th Cir. 2015) .................................................... 56

*U.S. Search, LLC v. U.S. Search.com Inc.*,
   300 F.3d 517 (4th Cir. 2002) .................................................... 56

**Statutes, Regulations, and Rules**

15 U.S.C. § 1051................................................................................ 5

15 U.S.C. § 1052(e)(2) .................................................................... 17

15 U.S.C. § 1054................................................................4, 5, 45

15 U.S.C. § 1063.............................................................................. 16

15 U.S.C. § 1064(3) ...................................................................5, 6, 28

15 U.S.C. § 1064(5)(A) ............................................................ 6, 21

15 U.S.C. § 1071.............................................................................. 18

15 U.S.C. § 1127.......................................................................... 4, 17

21 C.F.R. § 133.10(a) ..................................................................... 12

21 C.F.R. § 133.149................................................................12, 43

# TABLE OF AUTHORITIES
## (continued)

**Statutes, Regulations, and Rules (continued)**    **Page(s)**

21 C.F.R. § 133.149(a) ................................................................. 7

21 C.F.R. § 133.149(a)(1) ........................................................... 44

21 C.F.R. § 133.184 .................................................................... 46

42 Fed. Reg. 14302 (Mar. 15, 1977) ......................................... 43

Fed. R. Civ. P. 56(a) .................................................................. 27

Fed. R. Evid. 801(c) ................................................................... 54

E.D. Va. Local R. 56(B) ............................................................. 32

## Other Authorities

J. Thomas McCarthy, *McCarthy on Trademarks and
    Unfair Competition* (5th ed. 2022) ...................................... 6, 45

U.S. Patent & Trademark Office, *Examination Guide 2-20,
    Marks Including Geographic Wording that Does Not
    Indicate Geographic Origin of Cheeses and Processed
    Meats* (May 2020) ............................................................45, 46

**INTRODUCTION**

This case is about whether the word "gruyere" should receive certification mark protection in the United States. The European Consortiums (appellants) want a cheese to be called "gruyere" only if it is produced in a limited region of Switzerland and France. The U.S. Dairy Groups (appellees) oppose that effort because "gruyere" means a type of cheese, one that can be made anywhere and has in fact been made outside of Switzerland and France for decades. If the European Consortiums have their way, then the word "gruyere"—not a logo but the word itself—will be forced out of common use in the United States and into a new role as a restrictive certification mark. That would hurt the many U.S. grocery stores, restaurants, and other retailers that sell non-Swiss, non-French gruyere, as well as the many U.S. cheesemakers that produce gruyere and the U.S. distributors that import it from non-Swiss, non-French sources. It also would confuse the consumers who buy those products.

Fortunately, every judge who has heard this case has agreed that the word "gruyere" cannot be registered as a certification

mark.  It is black-letter law that a term cannot be registered if it is generic—that is, if it refers to a type of product, rather than a product from a particular source.  After extensive discovery and a trial, the Trademark Trial and Appeal Board (TTAB) in the U.S. Patent and Trademark Office (PTO) found "no doubt" that "gruyere" is a generic term for a type of cheese that can be made anywhere. JA 77.  The TTAB relied on voluminous evidence showing that consumers in the United States understand "gruyere" to refer to a type of cheese, rather than cheese made only in a specific geographic region.

On *de novo* review, and after giving the European Consortiums the opportunity to discover and present additional evidence, the district court agreed.  It granted summary judgment to the U.S. Dairy Groups, concluding that the undisputed evidence "overwhelmingly demonstrate[s] the generic nature of the word **GRUYERE**." JA 1905 (internal quotation marks omitted).

That conclusion is correct.  Whether the term is generic depends on whether consumers in the United States understand it to

refer to a type of product, rather than a product coming from a specific place. Here, the U.S. Dairy Groups provided overwhelming and undisputed evidence that U.S. consumers understand "gruyere" to refer to a type of cheese, not a cheese made only in a particular geographic region. That evidence included commercial and government data showing that consumers in the United States regularly purchase gruyere not produced in Switzerland or France; cheese labels for gruyere sold in the United States specifically showing that the cheese was not produced in Switzerland or France; U.S. food labeling standards for gruyere, which do not require it to be produced in Switzerland or France; and reference materials (such as dictionaries, industry publications, and trade materials) showing that "gruyere" is commonly used to refer to a type of cheese, rather than cheese from a particular geographic region.

The European Consortiums do not dispute any of that evidence. Instead, they simply argue that it is not sufficient to show that the term "gruyere" has become generic, rehashing the unsuccessful arguments they made to the TTAB and the district court.

3

They are incorrect, and they do not identify any genuine issue of material fact for trial.

The district court applied settled law to the undisputed facts in this case and correctly concluded that "gruyere" is generic for a type of cheese. This Court should affirm.

## STATEMENT OF THE ISSUE

Whether the district court correctly granted summary judgment to the U.S. Dairy Groups because the term "gruyere" is generic for a type of cheese and, therefore, is not eligible for registration as a certification mark under 15 U.S.C. § 1054.

## STATEMENT OF THE CASE

### A.    Legal Background

A certification mark is a "word, name, symbol, or device" used "to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services." 15 U.S.C. § 1127. Certification marks often belong to trade groups, which allow producers and sellers to apply the mark to products that meet the group's established standards. Examples are certification marks that show a product's

 quality (like the "Underwriters Laboratories" mark for certain electronics), U.S. Reg. No. 6,316,052;

 origin (like the "Grown in Idaho" mark for potatoes grown in Idaho), U.S. Reg. No. 2,914,307;

 materials of manufacture (like the "OU" symbol for certain Kosher products), U.S. Reg. No. 3,882,895; or

 method of manufacture (like the symbol specifying union-member production), U.S. Reg. No. 507,088.

Certification marks generally are protected and regulated in the same way as trademarks. 15 U.S.C. § 1054. A person seeking to register a certification mark applies to the PTO, which reviews the application and decides whether to register the mark. 15 U.S.C. §§ 1051, 1054. As with trademarks generally, a certification mark cannot be registered if the mark is generic. *See PTO v. Booking.com B.V.*, 140 S. Ct. 2298, 2303 (2020). If a mark that previously had been registered becomes generic, its registration can be cancelled. 15 U.S.C. § 1064(3).

A mark is generic if it "is incapable of distinguishing one producer's goods from the goods of others." *Booking.com B.V.*, 140 S. Ct. at 2303 (internal quotation marks and brackets omitted). That

is, "a 'generic' term names a 'class' of goods or services, rather than any particular feature or exemplification of the class." *Id.* at 2304. Whether a term is generic depends on what the term means to consumers—specifically, whether consumers purchasing the product primarily understand the term to refer to "the nature or class of the product or service, rather than an indication of source." *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996); *see* 15 U.S.C. § 1064(3) (genericness depends on "[t]he primary significance of the registered mark to the relevant public").

Further, the owner of a certification mark must maintain control over the mark. If the owner "does not control, or is not able legitimately to exercise control over" a mark's use, the mark is nonregistrable or subject to cancellation. 15 U.S.C. § 1064(5)(A). The owner of the mark has "an affirmative obligation" to monitor the mark's use and to take reasonable steps to ensure that the mark is used only on certified products. *Midwest Plastic Fabricators, Inc. v. Underwriters Labs. Inc.*, 906 F.2d 1568, 1572 (Fed. Cir. 1990) (citation omitted); *see* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:92 (5th ed. 2022) (McCarthy).

This requirement is intended "to protect the public from being misled." *Midwest Plastic Fabricators, Inc.*, 906 F.2d at 1572.

## B.    Factual Background

As the district court noted, JA 1878-1883, the following facts are undisputed.

### 1.    Gruyere production around the world and sales of non-Swiss, non-French gruyere in the United States

Gruyere is a type of cheese—one that generally is mild-flavored, is comprised of at least 45% milkfat, and is at least 90 days old. *See* 21 C.F.R. § 133.149(a). Although gruyere originated in a certain region of Switzerland and France centuries ago, gruyere production has since expanded to many other areas around the world. JA 1878.

Consumers in the United States import gruyere from many different places. By 1995, the United States was importing large quantities of gruyere from many countries other than Switzerland and France, including the Netherlands (approximately 2.3 million kilograms in 1995), Belgium (~658,000 kg), Austria (~476,000 kg), and Germany (~168,000 kg). JA 127. From 2010-2020, gruyere

was imported from Switzerland, France, the Netherlands, Germany, Egypt, Denmark, Austria, Belgium, Ireland, the Czech Republic, Italy, and Tunisia. JA 1880 (citing U.S. Department of Agriculture (USDA) import data).

Gruyere also is produced by many companies in the United States. For example, in the 1980s, Roth Käse, an American cheesemaker, began producing gruyere in Wisconsin. JA 1507. That cheese was labeled and sold as "gruyere." JA 1513-1514. By the late 2000s, Roth Käse was producing more than two million pounds of gruyere annually in Wisconsin. JA 1514.

Around 2010, a Swiss company purchased Roth Käse, forming a new entity called Emmi Roth, which continued producing gruyere in Wisconsin. JA 1880; *see* JA 1507. Emmi Roth sells some of its gruyere through its house brand then sells the rest to retailers that "private label" the cheese, meaning they sell it under their own brands and labels. JA 1879-1881. In 2013, in order to appease its Swiss parent, Emmi Roth contractually agreed with the Swiss Consortium to cease labeling its house brand "gruyere." JA 929-936; *see* JA 1507-1508, JA 1837, JA 1849-1853. But in that agreement,

8

Emmi Roth reserved the right to continue allowing its customers to sell the cheese as "gruyere."  JA 1881; *see* JA 930 (agreement), JA 932-936 (translations).  In the years since, Emmi Roth has sold significant amounts of its Wisconsin-made gruyere to grocery stores and to other customers that private label and sell the cheese as "gruyere."  JA 1833-1834, JA 1840, JA 1868-1870; *see* JA 1881 (providing specific sales data).

Other American cheesemakers also produce gruyere and sell it in the United States.  For example, Glanbia produces gruyere in Idaho.  JA 1886; *see* JA 1816, JA 1819-1820.  From 2018-2020, it sold millions of pounds of cheese labeled "gruyere" in the United States.  JA 1886; *see* JA 1816, JA 1818-1820; *see also* European Consortiums' Br. 21 (acknowledging that fact).  Gruyere made in the United States by Emmi Roth, Glanbia, and other smaller producers is offered to consumers in hundreds of restaurants and supermarkets in the United States.  JA 1283-1284, JA 1304-1339.

Non-Swiss, non-French gruyere remains widely available in the United States.  "[M]any producers and retailers continue[] to

9

use the term **GRUYERE** to label cheese created outside the Gruyère region of Switzerland and France, including Boar's Head, Dairyfood USA, Dietz & Watson, Finlndia, Intersource, Red Apple, Trader Joe's, Wegmans, and Wood River Company." JA 1882. The following labels are examples of non-Swiss, non-French gruyere that U.S. consumers routinely encounter:















JA 942-944,   JA 964-968,   JA 992-1014,   JA 1016-1026,   JA 1791-1792, JA 1811, JA 1814, JA 1822-1823, JA 1825-1827.

> **2.    The European Consortiums' efforts to protect the word "gruyere"**

Gruyere has been granted certain protected status in Europe. JA 31-33, JA 1878-1879.  Specifically, the European Union gave Swiss gruyere a protected designation of origin, and the French Institute of Origin and Quality gave French gruyere a protected geo-

graphical origin.   JA 1878-1879; *see* JA 1676-1698 (Swiss standards), JA 1699-1704 (French standards).  As a result, gruyere sold in the European Union cannot be sold as "gruyere" unless it is made in a designated region of Switzerland and France and meets other required standards.  JA 1878-1879.  But this case is not about European protections of gruyere, and the parties agree that the European protections "do not control the use of the term **GRUYERE** in the United States."  JA 1879 n.2.

U.S. food-labeling laws do not require gruyere to be made in Switzerland or France to be labeled as "gruyere."  The Food and Drug Administration (FDA) has established standards of identity for many foods; they address criteria such as the composition of the food, its manufacture, and its origin.  *See* 21 C.F.R. §§ 133.10(a), 133.149.  The FDA's standard of identity for "gruyere" does not require a cheese to be produced in Switzerland or France to be called "gruyere"; instead, it simply identifies the characteristics of the cheese.  *See* 21 C.F.R. § 133.149.  The European Consortiums have never challenged or sought to change this regulation.   JA 1105, JA 1116.

"There is no record that [the European Consortiums] attempted to police the use of the term **GRUYERE** in the United States prior to 2012." JA 1882. From 2012 to 2017, the Swiss Consortium made some limited efforts to police use of the word "gruyere" in the U.S. market. JA 1882. It sent cease-and-desist letters asking some retailers and producers to stop using "gruyere" on non-Swiss (and occasionally non-French) cheeses. JA 1882; *see generally* JA 128-379. Those efforts largely failed. In response to the letters, many of the largest sellers of non-Swiss, non-French gruyere refused to stop calling their cheese "gruyere," JA 1882, including Boar's Head, JA 131-133, JA 992-994, JA 1008-1011, JA 1822-1823, JA 1825-1827; Dietz & Watson, JA 1791-1792, JA 1810-1811, JA 1814; Trader Joe's, JA 255-256, JA 287-292, JA 1025-1029; and Wegmans, JA 297-300, JA 943-945, JA 964-968.

During that time, the French Consortium did nothing to protect the word "gruyere." It did not join any of the Swiss Consortium's cease-and-desist letters or send any of its own. *See generally* JA 128-379. And the Swiss Consortium's letters often undermined

13

the French Consortium by objecting to sellers using the word "gruyere" for French-made gruyere.  JA 235-240, JA 257-263.

### C.  Procedural History

#### 1.  The European Consortiums' trademark applications

The Swiss Consortium applied to the PTO for three separate "gruyere"-related certification marks, including the application at issue here.  The French Consortium joined only the present application.

In 2010, the Swiss Consortium applied for a certification mark that the PTO rejected.  The Swiss Consortium sought to register the words "LE GRUYERE" as a certification mark that can be applied only to gruyere cheese from the Gruyère region of Switzerland.  JA 640-642.  That application did not include French gruyere cheese.  JA 640-642.  The PTO examiner denied the application, finding that the evidence "clearly show[ed] that the U.S. consumer views gruyere as a style of cheese that can be made anywhere and is not just a cheese from Gruyere, Switzerland," making the word "gruyere" generic.  JA 647.  The Swiss Consortium had the opportunity to respond to this denial and present additional evidence and

argument, but instead it abandoned the "LE GRUYERE" application. JA 643.

Also in 2010, the Swiss Consortium applied for a certification mark that the PTO granted. JA 1879; *see* JA 926-928. The mark is a logo featuring the words "LE GRUYÈRE SWITZERLAND AOC" and including a stylized font, a solid bar around "SWITZERLAND," a stylized square containing the letters "AOC," and a stylized Swiss cross:



JA 928. This application differed significantly from the previous one, because it covered a design rather than just words. JA 1880; *compare* JA 927 ("AOC" design mark), *with* JA 640 ("LE GRUY-ERE" word mark). The PTO examiner approved this logo as sufficiently distinct to designate a cheese that originates in the Gruyère region of Switzerland. JA 927. The result is that this particular logo can be applied to cheese sold in the United States only if it originates in the Gruyère region of Switzerland (but not France).

JA 1879.  The U.S. Dairy Groups do not object to the Swiss Consortium's use of this logo mark, its registration, or its enforcement against infringers, and they would not object to the French Consortium registering its own similarly distinctive logo to identify French gruyere.

In 2015, the European Consortiums filed the application at issue in this case.  With this application, the European Consortiums sought to register the word "GRUYERE" itself as a certification mark.  JA 1875; *see* JA 383.  This mark is "much broader" than the design mark already allowed; it "would require that *any* time the term **GRUYERE** is used on cheese [in the United States] that the cheese must have been produced in the Gruyère region of Switzerland and France."  JA 1880.  The PTO examiner allowed the publication of the mark for opposition, and the U.S. Dairy Groups opposed registration of the mark.  JA 385; *see* 15 U.S.C. § 1063.

### 2.    The TTAB's decision

The parties developed an "extensive record," and "argued the issue fully" before the TTAB.  JA 1875.  The U.S. Dairy Groups opposed registration of the European Consortiums' proposed mark on

16

two grounds: (1) the word "gruyere" is generic for a type of cheese, and thus is not registrable under 15 U.S.C. § 1052(e)(1), and (2) the European Consortiums have not maintained control over the use of the mark, and thus the mark cannot be registered under 15 U.S.C. §§ 1054 and 1127. JA 17.

After lengthy discovery, the parties submitted voluminous trial evidence to the TTAB. *See* JA 17-21, JA 42-64 (summarizing the parties' evidentiary submissions). The European Consortiums "raised over 150 individual evidentiary objections in a bare bones fashion with little or no argument supporting each objection." JA 21. The TTAB rejected the majority of the Consortiums' evidentiary objections as "late" or "without merit." JA 21-24.

The TTAB held that the term "gruyere" is generic and therefore cannot be registered as a certification mark. JA 13-77. The TTAB considered whether the purchasing public in the United States would understand "gruyere" to refer to a type of cheese or only a cheese made in a particular region of Switzerland and France. JA 39-40. It thoroughly reviewed the record evidence, which included witness testimony from cheese producers; sales

data for gruyere sold in the United States; labels on gruyere cheese sold in the United States; U.S. government data about gruyere imports; and various sources of common meaning (including news articles and dictionary definitions). JA 41-77.

The TTAB concluded that "purchasers and consumers of cheese understand the term 'gruyere' as a designation that primarily refers to a category within the genus of cheese that can come from anywhere." JA 77. The one-sided record left the TTAB with "no doubt" as to whether the term "gruyere" is generic. JA 77. Because its genericness holding made the proposed mark unregistrable, the TTAB did not address the U.S. Dairy Groups' separate lack-of-control objection.

### 3.    The district court's decision

The European Consortiums appealed to the district court. Under 15 U.S.C. § 1071, the Consortiums had the opportunity to discover and provide additional evidence, and the district court reviewed all the evidence *de novo*, with no deference to the TTAB's decision. JA 1874, JA 1877, JA 1884; *see Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 298 (4th Cir. 2021).

18

After the close of discovery, the U.S. Dairy Groups moved for summary judgment. JA 1874. The European Consortiums did not cross-move for summary judgment; they have never contended that the evidence of genericness is so one-sided as to support summary judgment in their favor.

The district court granted summary judgment to the U.S. Dairy Groups. JA 1874-1905. The court noted that the "procedural and substantive legal principles that govern this case are undisputed and well-settled," and the only issue is whether "cheese purchasers in the United States understand the term **GRUYERE** to refer only to a specific type of cheese produced in the Gruyère region of Switzerland and France" or "as a generic term which refers to a type of cheese regardless of where the cheese is produced." JA 1875-1876. The court acknowledged that genericness is a question of fact that is "not often appropriate for resolution on a motion for summary judgment," but it determined that summary judgment is appropriate in this case because "the evidence of genericness [i]s so one-sided that no genuine issue of fact exist[s]." JA 1884 (quoting *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 546 (4th Cir.

2004), *abrogated on other grounds by Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014)).  The court also noted that, if it were to hold a bench trial, it "would be required to find further facts," and those facts would provide additional support for the finding of genericness.  JA 1885-1886.

The district court concluded that the "record evidence overwhelmingly demonstrate[s] the generic nature of the word" gruyere.  JA 1905 (citation omitted).  That evidence, the court explained, consists of the FDA standard of identity for gruyere, which permits cheese to be sold as "gruyere" in the United States regardless of where it is produced, JA 1890-1892; import data, sales data, and cheese labels, which show that gruyere produced outside of Switzerland and France "pervades the cheese market in the United States and is purchased in substantial quantities" here, JA 1892-1901; and evidence of common usage and industry practice, which establishes that the word "gruyere" "is not restricted to cheese produced in the Gruyère region of Switzerland and France," JA 1902.

Because the European Consortiums "failed to show that any triable issue of fact exists," JA 1901, the district court granted summary judgment to the U.S. Dairy Groups, JA 1905.[1]

## SUMMARY OF ARGUMENT

The European Consortiums seek to register an exceptionally broad certification mark, one that would preclude U.S. businesses, such as restaurants, grocery stores, and cheese producers, from using the word "gruyere" for any cheese unless that cheese is produced in a specific region of Switzerland and France. This proposed mark is "much broader" than the design-mark registration the Swiss Consortium already has obtained to protect its Swiss gruyere. JA 1880.

---

[1] The district court did not address the U.S. Dairy Groups' alternative argument that the Consortiums cannot register "gruyere" as a certification mark because they failed to exercise control over that mark. JA 1875 n.1; *see* 15 U.S.C. § 1064(5)(A). Here, significant evidence shows that the Consortiums failed to control the mark. JA 1898 (district court's observation that the "efforts to control the use of the term . . . **GRUYERE** have been ineffective"). If this Court reverses the district court's grant of summary judgment on genericness, the district court will need to further consider the failure-to-control argument on remand. JA 1875-1876 & n.1. The Consortiums contend (Br. 23 n.3) that the genericness and failure-to-control arguments are the same, but they are two separate legal issues; a certification mark that is non-generic still can be subject to cancellation if the owner does not maintain control of it.

21

As the TTAB and the district court correctly concluded, the European Consortiums cannot register "gruyere" as a certification mark because even if the term once was used to refer only to cheese made in the Gruyère region of Switzerland and France, U.S. consumers now understand "gruyere" to refer to a type of cheese that can be made anywhere. The evidence of genericness is so overwhelming and one-sided that summary judgment is appropriate.

A.     The district court applied settled legal standards to the facts of this case. It recognized that, at summary judgment, it was required to view the facts in the light most favorable to the European Consortiums, and that is what it did. It correctly explained that whether a term is generic depends on whether U.S. consumers understand it as referring to a type of product or to a product that originates only from a certain source. And it recognized that, under this Court's precedents, it may grant summary judgment on the issue of genericness when the evidence overwhelmingly establishes that a term is generic.

The European Consortiums do not dispute that the district court stated the correct legal standards for summary judgment and

22

for the substantive issue of genericness. Instead, they argue that the court actually found facts at summary judgment, which it was not allowed to do. That is incorrect. The court carefully set out the undisputed facts and then explained how those undisputed facts establish that "gruyere" is generic. The court also noted that, even if it held a bench trial, the European Consortiums would lose on the issue of genericness. But the court did not hold a bench trial or find any facts that were necessary for its summary judgment decision.

B.    As the district court recognized, the U.S. Dairy Groups provided overwhelming evidence of genericness that justifies summary judgment. They provided many types of evidence about how U.S. consumers understand the term "gruyere," including U.S. food labeling standards; actual cheese labels showing non-Swiss, non-French gruyere sold in the United States; sales and import data about which non-Swiss, non-French producers sell gruyere in the United States; testimony from cheese producers about gruyere produced outside of Switzerland and France and sold in the United

States; and evidence of common usage showing that the term "gruy-ere" is no longer understood to refer to only Swiss- and French-made cheese.

The European Consortiums provided very little evidence of their own, both before the TTAB and when they had the opportunity to discover and provide additional evidence in the *de novo* proceeding before the district court. Before the district court, they simply rehashed arguments about the U.S. Dairy Groups' evidence that the TTAB rejected. Those arguments, the district court explained, are just "unsupported assertions" and "conclusory denials" that do not create "a triable issue of fact" on genericness. JA 1901.

C.   The European Consortiums argue that the district court erred in its legal analysis by not requiring a consumer survey and by not making a finding about what a majority of consumers believe. But as this Court has recognized, a consumer survey is not required; many types of evidence can shed light on how U.S. consumers understand the term "gruyere." Besides, the European Consortiums did not provide a consumer survey, either. And the district court *did* find that U.S. consumers primarily understand

24

"gruyere" to refer to a type of cheese, rather than cheese from a particular geographic location. The district court clearly applied the standard set out by this Court, and it was not required to use any magic words (like "majority of consumers") to find genericness.

D.    The bottom line is that the U.S. Dairy Groups provided overwhelming evidence that U.S. consumers understand "gruyere" to be generic for a type of cheese, and the European Consortiums provided almost no evidence to the contrary. The result is a record that is so one-sided that summary judgment is warranted. Although the European Consortiums argue that genuine issues of material fact exist, they do not identify any fact issues for trial. That is because the relevant underlying facts all are undisputed. And under those undisputed facts, the European Consortiums simply cannot establish that the broad term "gruyere" is eligible for certification mark protection.

This Court should affirm.

## ARGUMENT

## THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO THE U.S. DAIRY GROUPS BECAUSE THE TERM "GRUYERE" IS GENERIC

It is black-letter law that "generic terms can never obtain trademark protection." *Booking.com B.V. v. PTO*, 915 F.3d 171, 177 (4th Cir.), *aff'd*, 140 S. Ct. 2298 (2020). The issue here is whether the term "gruyere" is generic, meaning whether U.S. consumers primarily understand it to refer to a type of cheese rather than cheese from a particular source. As the district court recognized, the answer clearly is yes. The record evidence overwhelmingly shows that even if U.S. consumers may have once understood the term "gruyere" to refer to a cheese made only in the Gruyère region of Switzerland and France, they now understand that gruyere cheese can be made anywhere.

### A. The District Court Applied The Settled Summary Judgment Standard And Settled Trademark Law To Undisputed Facts

This case involves the application of undisputed legal standards to the particular facts of this case. JA 1876 ("The procedural and substantive legal principles that govern this case are undisputed and well-settled."). The parties agree that the district court

26

correctly identified the governing law.  And contrary to the European Consortiums' contention, the district court did not exceed its permissible role on summary judgment.

### 1. The district court applied settled law to the facts here

First, the district court used the settled summary judgment standard.  It recognized that summary judgment is appropriate only "when there is 'no genuine issue as to any material fact' and based on those undisputed facts the moving party 'is entitled to judgment as a matter of law.'"  JA 1876 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see* Fed. R. Civ. P. 56(a).  It also recognized that "[t]he party opposing summary judgment must provide more than mere denials and allegations to create a dispute of material fact and must instead 'set forth specific facts showing that there is a genuine issue for trial.'"  JA 1876 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And the district court recognized that it must "view the evidence in the light most favorable to . . . the non-movant," meaning the Consortiums.  JA 1876 (quoting *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002)); *see, e.g.*, *Dulaney v. Packaging Corp. of Am.*,

27

673 F.3d 323, 324 (4th Cir. 2012).  The European Consortiums agree that this is the correct summary judgment standard.  *See* Br. 28-29.

The district court also correctly stated the governing substantive law.  It explained that a term may not be registered as any type of trademark, including a certification mark, if it is generic. JA 1887 (citing *Booking.com*, 140 S. Ct. at 2301).  It also recognized that "[a] term which was once non-generic and conveyed the quality or origins of goods can become generic over time through a process called genericide, which occurs when a generic term 'ceases to identify in the public's mind the particular source of a product or service but rather identifies a class of product or service, regardless of source.'"  JA 1887 (quoting *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996)).  And the court recognized that whether a term is generic depends on "[t]he primary significance of the [term] to the relevant public," JA 1887 (quoting 15 U.S.C. § 1064(3))—specifically, whether a U.S. consumer would understand the term to indicate "the nature or class of the product or service, rather than an indication of [a particular geographic] source," JA 1887 (quoting

*Glover*, 74 F.3d at 59). Again, the European Consortiums agree that this is the governing law. Br. 23, 28, 30.

Finally, the district court correctly recognized that genericness is an issue that can be decided on summary judgment. The district court recognized that whether a term is generic "is a question of fact." JA 1884 (quoting *Royal Crown Co., Inc. v. The Coca-Cola Co.*, 892 F.3d 1358, 1364 (Fed Cir. 2018)). The district court noted that although fact questions are "not often appropriate for resolution on a motion for summary judgment," this Court has held that genericness can be decided on summary judgment where "'the evidence of genericness was so one-sided that no genuine issue of fact existed.'" JA 1884 (quoting *Retail Servs., Inc.*, 364 F.3d at 546). In fact, this Court repeatedly has approved resolution of genericness on summary judgment.[2] The Consortiums agree that *Retail Services* establishes when summary judgment on genericness is allowed. Br. 28-30.

---

[2]  *See, e.g.*, *Am. Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 818-21 (4th Cir. 2001); *Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc.*, No. 88-1321, 870 F.2d 654, 1989 WL 21392, at *1 (4th Cir. 1989) (table).

### 2. The district court did not exceed its permissible role on summary judgment

The European Consortiums contend that, although the district court stated the correct legal standard for summary judgment, the court did not actually apply that standard, but instead made factual findings on summary judgment. Br. 31. That is wrong. The court specifically identified "the record facts as to which no genuine dispute exists," JA 1878-1884, and then explained how those facts conclusively establish that the term "gruyere" is generic, JA 1888-1904. Tellingly, the Consortiums never identify precisely which disputed facts the district court supposedly found, why those facts matter, or what genuine issues of material fact exist. The only "fact in dispute" they identify is the ultimate question of genericness. Br. 8; *see* Br. 22.

The European Consortiums point to the portion of the district court's opinion where it noted that, if it held a bench trial, it would find additional facts. Br. 31; *see* JA 1884-1886. The Consortiums argue that this shows that the district court incorrectly drew inferences against them at summary judgment. Br. 31. That is incorrect; the court merely stated what it "would find" in a bench trial.

30

JA 1885.  The court was careful to note that the legal standards for summary judgment and a bench trial are different, because on summary judgment, the district court "view[s] the evidence in the light most favorable to" the non-movant, and in a bench trial, the district court "is required to assess the credibility of witnesses and has the duty to weigh evidence and draw reasonable inferences and deductions from that evidence."  JA 1884-1885 (citations omitted).

Significantly, the underlying historical facts in this case all are undisputed.  Instead, the parties' dispute is about the legal significance of those facts—namely, whether they establish that the term "gruyere" is generic.  The district court repeatedly relied on the "undisputed evidence" to support its holding. JA 1896, JA 1899, JA 1905; *see* JA 1894, JA 1897, JA 1903.  The court did not need to find any facts here, because the undisputed "factual record makes it abundantly clear that the term **GRUYERE** has now, over time, become generic to cheese purchasers in the United States." JA 1888.  Indeed, even in the section where the district court was

describing what additional facts it would find in a bench trial, the district court was reciting undisputed facts.[3]

The record makes clear that the Consortiums did not dispute the relevant underlying facts. Under the district court's local rules and its scheduling order, the U.S. Dairy Groups were supposed to provide a statement of undisputed material facts, and in response, the Consortiums were supposed to identify which facts are disputed. *See* E.D. Va. Local R. 56(B); Scheduling Order § 11(e), ECF No. 45. In particular, the Consortiums were supposed to provide a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the

---

[3]  For example, the parties do not dispute that Emmi Roth has produced gruyere cheese in Wisconsin for decades and sells millions of pounds of it in the United States annually; that at least some of that cheese is labeled "gruyere" when sold in the United States; that "hundreds of thousands of pounds" of non-Swiss, non-French gruyere sold in the United States annually is labeled "gruyere"; that the European Consortiums did not attempt to limit the use of the term "gruyere" in the United States until 2012; and that despite the European Consortiums' efforts, many U.S. retailers continue to use the word "gruyere" to describe non-Swiss, non-French cheese. JA 1885-1886; *see* Mem. in Supp. of Summ. J. 2-9, ECF No. 79.

facts alleged to be in dispute. Scheduling Order § 11(e). The Scheduling Order also warned: "The Court may assume that any fact identified by the movant as undisputed in the movant's brief that is not specifically controverted in the nonmovant's brief . . . is admitted for the purpose of deciding the motion for summary judgment." *Id.*

The U.S. Dairy Groups provided their statement of undisputed material facts. Mem. in Supp. of Summ. J. 2-9, ECF No. 79. In response, the Consortiums filed a brief opposing summary judgment, which did not include the required section listing any material disputed facts. Mem. in Opp. to Summ. J. 2-11, ECF No. 86. In light of the Consortiums' failure to dispute any material facts below, they cannot now credibly claim that the district court erred by finding facts.

## B.  The Record Evidence Overwhelmingly Establishes That The Term "Gruyere" Is Generic

Courts may look to "any competent source" to assess a term's genericness, so long as the source is relevant to how a U.S. purchaser would understand the term. JA 1888 (quoting *In re Cordua Restaurants, Inc.*, 823 F.3d 594, 599 (Fed. Cir. 2016)). Here, the

U.S. Dairy Groups provided many different types of evidence to show genericness. In response, the European Consortiums provided very little evidence, instead choosing to make "conclusory denials" and "unsupported assertions." JA 1901. Although the Consortiums had the opportunity to discover and present additional evidence on *de novo* review before the district court, they did not meaningfully add to the evidence in the record. *See* JA 1663-1675, JA 1737-1740, JA 1758-1765, JA 1775-1777 (Consortiums' limited additional evidence).

After reviewing all of the evidence, the district court correctly recognized that ample "undisputed evidence" shows that "the primary significance of the term **GRUYERE**, as understood by the relevant purchasing public in the United States, is a generic term for a type of cheese and does not refer solely to cheese from a specific geographic region." JA 1905. On appeal, the Consortiums rehash their attacks on various pieces of evidence, Br. 32-52, but none of them undermines the district court's conclusion.

### 1. Imported gruyere not from Switzerland or France

First, the overwhelming and undisputed evidence shows that "a very large amount of cheese produced outside the Gruyere region of Switzerland and France is imported into the United States and sold here labeled as **GRUYERE**." JA 1892 (italics omitted). For example, USDA import data shows that since 1995, the United States has imported millions of kilograms of gruyere from non-Swiss, non-French countries. JA 127, JA 381; *see* JA 1893-1894 & n.4. In fact, from 2010-2020, "the majority of **GRUYERE**-labeled cheese imported into the United States was imported from the Netherlands and Germany, not from Switzerland or France." JA 1893 (citing JA 381). Now, even Egypt exports more gruyere than France to the United States. JA 381. There are many foreign sources of non-Swiss, non-French gruyere, including Germany (Boar's Head, JA 1008-1009); Estonia (Finlandia, JA 995-996); and Austria (Alps brand, JA 1060-1073). The Consortiums do not dispute that the "majority of gruyere sold in the U.S. is produced in the U.S. or in other non-Swiss, non-French countries." Mem. in Supp. of Summ. J. 4, ¶ 9, ECF No. 79.

35

The European Consortiums argue that this imported cheese is not sold to consumers as "gruyere," Br. 40-42, but the record evidence directly contradicts that argument. For example, the Hickory Smoked Gruyere product sold by Boar's Head is imported from Germany, labeled as "gruyere" and as a "PRODUCT OF GERMANY," then sold in large quantities to U.S. consumers:



JA 1825; JA 1827. So is Dietz & Watson's German-made gruyere:

 

JA 1810-1811, JA 1814.   Together, these two non-Swiss, non-French imported cheeses—both of which indisputably are labeled "gruyere"—have accounted, over several years, for hundreds of thousands of pounds of the gruyere sold to U.S. consumers. JA 1814 (Dietz & Watson amounts), JA 1825 (Boar's Head amounts).

Thus, the Consortium's argument that the imported cheese is not sold in the United States as "gruyere" "is flatly contradicted by the undisputed record evidence, which shows that imported cheese produced outside the Gruyere region of Switzerland and France is sold to consumers labeled as **GRUYERE**."  JA 1894; *see* JA 1894-1896.  The fact that consumers of imported gruyere products often encounter non-Swiss, non-French gruyere in the marketplace is probative evidence of genericness.  *See, e.g.*, *Colt Def. LLC v. Bush-master Firearms, Inc.*, 486 F.3d 701, 706 (1st Cir. 2007) ("the more members of the public see a term used by competitors in the field, the less likely they will be to identify the term with one particular producer" or place of manufacture).

37

The European Consortiums note that in 2020, the United States imported more Swiss gruyere than German gruyere. Br. 41-42. That misses the point. The point is that a significant amount of non-Swiss, non-French gruyere is sold in the United States as "gruyere," which shows that the purchasing public does not associate "gruyere" with only Swiss or French gruyere. JA 1896. That evidence is "highly probative" because it "'establishes that when purchasers walk into retail stores and ask for [a product], they regularly mean any brand of [the product] and not specifically [one manufacturer's] products.'" JA 1892 (quoting *Glover*, 74 F.3d at 59).

Finally, although the European Consortiums "d[id] not challenge the accuracy or authenticity of this data" below, JA 1893 n.4, they now suggest that it does not show gruyere imports at all, because the USDA's import table refers to "Gruyere-Process Cheese" rather than "Gruyere," Br. 40-41. But as the district court recognized, the table plainly refers to the gruyere style of cheese, and the data in the table is backed up by examples of actual labels used to sell the cheese in the United States. JA 1894-1896. The European

Consortiums provide no evidence showing that the table is referring to something other than gruyere.

### 2. American-made gruyere

The district court also relied on "undisputed evidence" that two large producers, and many smaller ones, are producing gruyere in the United States and selling it in the United States labeled as "gruyere." JA 1896-1901. Among those producers are Emmi Roth in Wisconsin, JA 1828-1870; Glanbia in Idaho, JA 1815-1820; Red Apple Cheese in Wisconsin, JA 1013-1014; and Burnett Dairy in Wisconsin, JA 997-1006. Over the past decade, those cheesemakers have produced well over 10 million pounds of gruyere in the United States. JA 1897, JA 1899.

That cheese often is labeled "gruyere." For example, the grocery store chain Wegmans sells Emmi Roth's Wisconsin-made gruyere under its own private label as "Mild Gruyere," and Boar's Head, Red Apple Cheese, and Burnett Dairy all label their U.S.-made products "gruyere":







JA 968, JA 1013, JA 1020, JA 1826; *see* JA 1881.

The experience of Emmi Roth establishes that U.S.-made gruyere pervades the U.S. cheese market. Emmi Roth has been producing gruyere in Wisconsin since the 1980s; it labeled that cheese as "gruyere" until 2013; and since 2013, it has continued to

allow its private-label customers (such as grocery stores) to label its cheese "gruyere," despite the European Consortiums' requests to stop that practice. JA 1896-1898; *see* JA 990. For example, Emmi Roth told a private-label customer that it "know[s] of course that [customer] sells our Wisconsin-made . . . cheese . . . as 'mild Gruyere,'" and confirmed that Emmi Roth did not object to that labeling but instead "fully support[s its] customers' rights to determine the labeling of their private label products." JA 946, JA 990.

Many retailers continue selling Emmi Roth's cheese as "gruyere" today. JA 1031-1034 (showing labeling). Undisputed sales figures substantiate the significant market presence of that cheese. JA 1897-1898. The annual amount of Emmi Roth's Wisconsin-produced, private-label gruyere sold in the United States is about *one-half* of the amount of gruyere cheese imported annually from Switzerland and *over 50 times* the amount imported annually from France. *Compare* JA 1849, *with* JA 1872-1873. And that is just for *one* U.S. producer—Emmi Roth.

The European Consortiums' response—based on supposition rather than evidence—is that perhaps not every piece of this U.S.-

41

produced gruyere was labeled "gruyere" when it was sold to American consumers. Br. 21, 43. But, as the district court recognized, millions of pounds of U.S.-produced gruyere were sold in the U.S. market, and "a substantial volume of" that was "sold as **GRUYERE**" by grocery stores such as Wegmans and Trader Joe's, suppliers such as Boar's Head, and producers such as Glanbia. JA 1897-1898. The evidence that U.S. companies are selling their cheese in the United States as "gruyere" is convincing evidence of genericness. *Royal Crown*, 892 F.3d at 1364; *see* JA 1899.

The European Consortiums also argue that the district court incorrectly gave "greater weight to a much smaller quantity of Wisconsin cheese," compared to Swiss imports. Br. 44-45. But genericness does not turn on a simple comparison of the amounts produced inside versus outside of Switzerland and France; it turns on whether U.S. consumers understand "gruyere" to refer to a type of cheese rather than a particular source. *See George & Co. LLC v. Imagination Ent. Ltd.,* 575 F.3d 383, 394 (4th Cir. 2009). Ample record evidence—including sales and import data—shows that consumers in the United States understand "gruyere" to refer to a type

of cheese. *See* pp. 35-39, *supra*. The Consortiums acknowledge that genericness is not simply a numbers game; it depends on consumer perceptions overall. Br. 24 ("The issue is . . . not where a majority of the cheese is made."); *id.* at 45-46 (genericness does not depend "on a comparison of product quantities"). Besides, as the Emmi Roth example and the import data show, the amounts of gruyere produced outside of Switzerland and France are enormous.

### 3.    U.S. food labeling standards

As additional evidence of genericness, the district court noted that food-labeling standards promulgated by the Food and Drug Administration identify gruyere based on its characteristics, rather than based on its geographic origin. JA 1890-92. The FDA's standards of identity "regulate those characteristics of a food label that would enable a food to be marketed as such, and to ensure that certain foods accord with consumer expectations." *Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 621 (4th Cir. 2015). Since 1977, the FDA has had a standard of identity for "[g]ruyere cheese." 21 C.F.R. § 133.149; *see* 42 Fed. Reg. 14302 (Mar. 15, 1977). It identifies gruyere as a cheese with a "mild flavor" that "contains small

holes or eyes," with a "minimum milkfat content" of "45 percent by weight," that is at least 90 days old and "may be pasteurized," and typically is produced using a certain procedure with certain ingredients. 21 C.F.R. § 133.149(a)(1).

Notably, this standard does not contain any requirement for where the cheese is made. That confirms that U.S. "consumer[s'] expectations," *Nemphos*, 775 F.3d at 621, are that "gruyere" is a type of cheese, rather than a cheese produced only in a certain region of Switzerland or France. *See Institut Nat'l Des Appellations D'Origine v. Vintners Intern. Co.*, 958 F.2d 1574, 1582 (Fed. Cir. 1992) (holding that Bureau of Alcohol Tobacco and Firearms regulations "lend support to the argument that the term [Chablis] is generic"); *Luxco, Inc. v. Consejo Regulador Del Tequila A.C.*, Opp. No. 91190827, 2017 WL 542344, at *9 (TTAB Jan. 30, 2017) (holding that Tobacco Tax and Trade Bureau "regulations are probative in determining whether a term is distinctive or generic").

The European Consortiums contend that the district court should not have considered the "gruyere" standard of identity as

evidence of genericness.  Br. 33-40.  But the PTO's trademark examination guide says to do just that.  It states that "inclusion on the FDA [standard of identity] . . . list is strong evidence that the term is generic for the particular cheese."  U.S. Patent & Trademark Office, *Examination Guide 2-20, Marks Including Geographic Wording that Does Not Indicate Geographic Origin of Cheeses and Processed Meats* 2 (May 2020) (*Guide*).  The European Consortiums suggest that the *Guide* applies only to trademarks, and not certification marks.  Br. 38.  But a certification mark is a type of trademark, and certification marks are governed by the same legal standards as trademarks, including the same standard for genericness.  *See* 15 U.S.C. § 1054; *see also* 3 McCarthy § 19.95.  So the *Guide* plainly applies here.

The European Consortiums argue that decisions from the Supreme Court and TTAB have undermined the importance of regulations to the genericness determination.  Br. 35-37 (citing cases).  None of the cited cases addresses the FDA's standards of identity, or states that government regulations are irrelevant to the genericness question.  Instead, *POM Wonderful LLC v. Coca-Cola Co.*, 573

45

U.S. 102 (2014), held only that a manufacturer could be sued on a trademark claim even though its product complied with FDA regulations, *id*. at 105, and *Luxco, Inc.*, *supra*, permitted registration of a certification mark for an alcoholic beverage even though another federal agency had authority to regulate its labeling, 2017 WL 542344 at \*9. Further, *Luxco*, like other decisions, recognizes that government regulations *can* be probative of genericness. *Id.*

The European Consortiums also note that standards of identity and certification marks are two different things. Br. 34-35, 38. True, but the point is that a standard of identity for a term is evidence of genericness. *Guide* 2. It is not dispositive evidence; for example, "Roquefort" has an FDA standard of identity and also is protected by a certification mark. *See* 21 C.F.R. § 133.184; JA 1877. But the *Guide* treats a standard of identity as "strong evidence" of genericness, JA 1891, and this Court has explained that a "standard of identity . . . ensure[s] that certain foods accord with consumer expectations," *Nemphos*, 775 F.3d at 621. So the district court was correct to treat the standard of identity as "relevant" evidence of genericness. JA 1891.

46

### 4.    Common usage

Significant evidence of common usage, including reference materials, media coverage, and industry practice, confirms that consumers understand "gruyere" to refer to a type of cheese, rather than only cheese made in a particular place.  JA 1901-1904.

For example, the dictionary definitions submitted by both sides, "[v]iewed as a whole . . . point[] to the conclusion that the term **GRUYERE** is not restricted to cheese produced in the Gruyère region of Switzerland and France." JA 1902.  Some definitions, like those provided by the U.S. Dairy Groups, refer to the cheese based on its characteristics, without referencing any specific location of production.  JA 1901-1902.[4]  Other definitions submitted by the European Consortiums define "gruyere" by reference to its geo-

---

[4]  For example, the *Merriam-Webster Dictionary* defines "gruyere cheese" as "a pressed whole-milk cheese of a pale yellow color and nutty flavor and usually with small holes"; the *American Heritage Dictionary of the English Language* defines "gruyere" as "[a] nutty, pale yellow, firm cheese made from cow's milk" without reference to any geographic origins; and the *English Oxford Living Dictionaries* defines "gruyere" as "[a] firm, tangy cheese."  JA 1901-1902.

47

graphic source.  JA 1902.[5]  And still others note that "gruyere" orig-

inated in Switzerland, or often is made in Switzerland and France,

but do not limit production to those areas.  JA 1901-1902.[6]  At most,

these definitions provide some support for the idea that gruyere

originated in Switzerland and France, and some support for the

idea that gruyere can be made anywhere.

The European Consortiums argue that the district court

should have found in its favor on summary judgment because both

parties offered conflicting definitions.  Br. 49-50.  But the district

court expressly acknowledged the limited conflict and noted that

"as a whole" the definitions clearly favor finding genericness.

JA 1902.

---

[5]  For example, the *Encyclopedia Britannica* defines "gruyere" as a "hard cow's-milk cheese produced in the vicinity of La Gruyère in southern Switzerland and in the Alpine Comté and Savoie regions of eastern France," and the *Free Dictionary* defines "gruyere" as a "kind of cheese made at Gruyère, Switzerland."  JA 1902.

[6]  For example, the *Merriam-Webster Dictionary* defines "gruyere" as "a firm cheese with small holes and a nutty flavor that is of Swiss origin," and the *Random House Dictionary* defines "gruyere" as "a firm yellow cow's milk cheese, especially of France and Switzerland, having small holes."  JA 1901-1902.

Even if the dictionary definitions conclusively supported the European Consortiums' view, other overwhelming evidence of common usage establishes that "gruyere" is generic.  For example, the U.S. Dairy Groups produced substantial evidence of industry publications and trade materials, newspaper articles, and websites, all referring to gruyere produced in Wisconsin or somewhere other than Switzerland and France.  JA 1902-1903.  The European Consortiums "did not offer any" opposing press or media usage.  JA 1903.  Instead, they "offered just four pieces of evidence:  two online-dictionary definitions . . . , one printout from Wikipedia, and one European cheese guide."  JA 1903.

The U.S. Dairy Groups also provided evidence that the World Championship Cheese Competition, which is held in the United States, featured non-Swiss, non-French gruyere entrants every year from 1995 to 2018.  JA 1904.  Although the European Consortiums offered evidence of gruyere entrants in a competition held in Europe, that evidence "does little to explain how cheese purchasers in the United States"—the "relevant purchasing public"—"understand the term."  JA 1904.

All of the common-usage evidence is highly probative of the fact that the "public understands the term . . . to refer to a type of" product. *In re Cordua*, 823 F.3d at 604. And here, the evidence "tilts strongly" in U.S. Dairy Groups' favor, "point[ing] clearly to the conclusion that . . . the term **GRUYERE** has come to have a well-accepted generic meaning." JA 1903-1904.

### 5.    Other evidence of genericness

In addition to the evidence relied upon by the district court, the U.S. Dairy Groups offered other evidence of genericness. That included the PTO's 2010 rejection of the Swiss Consortium's trademark application. The PTO examiner declined to register the words "LE GRUYERE" as a certification mark for Swiss gruyere cheese because "the U.S. consumer views gruyere as a style of cheese that can be made anywhere and is not just a cheese from Gruyere, Switzerland." JA 647. That evidence is significant, because as the European Consortiums concede, a "term that was initially a generic term cannot become non-generic." Br. 30 (citing *Booking.com B.V.*, 915 F.3d at 180).

The U.S. Dairy Groups also provided evidence of the European Consortiums' unsuccessful efforts to limit use of the term "gruyere." Before 2012, the European Consortiums made no effort to limit use of that term. JA 1882. From 2012 to 2017, the Swiss Consortium sent cease-and-desist letters that were largely unsuccessful in persuading American cheesemakers and sellers to stop calling their cheeses "gruyere," and the French Consortium did nothing at all. JA 1882; *see* JA 128-379. And the Swiss Consortium expressly permitted Emmi Roth to continue allowing its customers to label Emmi Roth cheese as "gruyere." JA 1885; *see* JA 934 (translated contract).

Further, the U.S. Dairy Groups provided other evidence showing that non-Swiss, non-French gruyere is called "gruyere" in the United States. For example, they pointed to the U.S. Harmonized Tariff Schedules, which lists tariff amounts for types of imported cheese, and categorizes "gruyere" as a type of cheese (not a cheese from a particular location). *See, e.g.*, JA 1128-1129, JA 1132, JA 1135, JA 1142, JA 1145, JA 1147, JA 1269. They also provided internet advertisements that included recipes for Bacon Mac &

51

Cheese with Wisconsin Gruyere, JA 1051, and Green Bean and Wisconsin Gruyere Casserole, JA 1054; product pages for Austrian gruyere, JA 1060, JA 1073; and an internet list of "ten best" gruyeres, which lists gruyeres from multiple countries, including the United States and Austria, JA 1076-1079.

Each of these further supports a finding of genericness, and the European Consortiums did not attempt to rebut any of them.

## C.     The District Court Was Not Required To Rely On A Consumer Survey Or Use Magic Words To Find Genericness

In addition to their various complaints about the evidence, the European Consortiums make two other arguments.  Neither has merit.

### 1.     A consumer survey is not required to find genericness

First, the European Consortiums contend that the district court erred by finding genericness without a consumer survey. Br. 24, 28, 32, 52.  But it is well established that, although consumer surveys "may be a preferred method of proving genericness," genericness can be proven without them.  *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1570 (Fed. Cir. 1995); *see Hunt*

52

*Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 255 (4th Cir. 2001).[7]  Many different sources of evidence can show genericness, including evidence of generic use in the marketplace; reference materials, such as dictionary definitions, press usage, and internet references; testimony of individuals in the trade; and government regulations.  *See, e.g.*, *Royal Crown Co.*, 892 F.3d at 1366; *In re Cordua*, 823 F.3d at 599; *Luxco*, 2017 WL 542344, at *9-10.  The European Consortiums cite no authority stating that a consumer survey is required to find genericness.

Further, courts do "not infer from [a party's] failure to provide survey evidence that such evidence would be harmful" to that

---

[7]  *See, e.g.*, *Royal Crown Co., Inc.*, 892 F.3d at 1366; *Colt Def. LLC*, 486 F.3d at 706 n.4; *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 400 (6th Cir. 2002); *Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc.*, 690 F. Supp. 1457, 1465 (D. Md. 1988), *aff'd*, 870 F.2d 654 (4th Cir. 1989); *Hickory Farms, Inc. v. Snackmasters, Inc.*, 509 F. Supp. 2d 716, 720 (N.D. Ill. 2007); *Gimix, Inc. v. JS&A Grp., Inc.*, No. 80C6592, 1982 WL 52164, at *2 (N.D. Ill. Jan. 13, 1982), *aff'd sub nom. Gimix, Inc. v. JS & A Grp.*, Inc., 699 F.2d 901 (7th Cir. 1983); *In re Hikari Sales USA, Inc.*, Serial No. 86439012, 2019 WL 1453259, at *3 (TTAB Mar. 29, 2019); *In re Cooperativa Produttori Latte E Fontina Valle D'Aosta*, 1986 WL 83578, at *3 (TTAB Mar. 19, 1986).

party's case. *Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.,* 685 F.3d 1046, 1054 (Fed. Cir. 2012). And even when a customer survey shows non-genericness, a court may find genericness based on other evidence. *Hunt Masters, Inc.*, 240 F.3d at 254-55.

In this case, the district court simply recognized that "the absence of a consumer survey by either party does not preclude summary judgment." JA 1889. Neither side submitted a consumer survey.[8] The court nonetheless had voluminous evidence in the record to decide summary judgment. It concluded that summary judgment was warranted because "the undisputed material facts make it abundantly clear that the term **GRUYERE** has come to be understood by cheese purchasers in the United States as a generic term." JA 1899.

---

[8] The only direct evidence of consumer perception that the Consortiums submitted was a declaration from one of their executives who testified that, when he attends U.S. trade shows, "[c]onsumers he speaks to know that GRUYÈRE is made in Switzerland and has a unique and distinctive flavor." Br. 12 (citing JA 1668, ¶ 13). That is not a consumer survey; it is inadmissible hearsay. *See* Fed. R. Evid. 801(c).

54

## 2. No magic words are required to find generic-ness

The European Consortiums' other argument is that the district court erred in granting summary judgment because it did not make a specific "finding that the term is generic to a majority of consumers." Br. 31; *see id.* at 24, 28, 44, 46. But in substance, that is exactly what the district court found.

Relying on this Court's precedent, the district court recognized that, "[t]o become generic, the primary significance of the mark must be its indication of the nature or class of the product or service," rather than an indication of source. JA 1887 (quoting *Glover*, 74 F.3d at 59). The district court repeatedly explained how the record evidence shows that the primary significance of "gruyere" to consumers is as a type of cheese:

- "[T]he factual record makes it abundantly clear that the term **GRUYERE** has now, over time, become generic to cheese purchasers in the United States." JA 1888.

- "The record evidence provides overwhelming evidence that cheese purchasers in the United States understand the term **GRUYERE** to be a generic term which refers to a type of cheese without restriction as to where that cheese is produced." JA 1889.

- "[T]he primary significance of the term **GRUYERE**, as understood by cheese purchasers in the United States, refers

55

to a generic category of cheese products, and not exclusively to a cheese produced in the Gruyère region of Switzerland and France." JA 1896.

• "[W]hen cheese consumers in the United States walk into a retail store and ask to purchase **GRUYERE** cheese, they do so without intending to limit their request only to Swiss or French-made cheese." JA 1892-1893.

The European Consortiums' argument amounts to an assertion that the district court had to use special "magic words" to find genericness, but that is simply wrong. This Court has routinely upheld genericness findings without requiring a specific finding about a "majority of consumers." *See, e.g.*, *Shammas v. Focarino*, 784 F.3d 219, 221 (4th Cir. 2015); *Retail Servs., Inc.*, 364 F.3d at 537; *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 (4th Cir. 2002); *Am. Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 815 (4th Cir. 2001); *Hunt Masters, Inc.,* 240 F.3d at 254. Here, the district court clearly understood what it needed to find to deem "gruyere" generic, and it actually made those findings.

## D. Summary Judgment Is Appropriate Because No Genuine Issue Of Material Fact Exists On Genericness

The ultimate question here is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

56

it is so one-sided that one party must prevail as a matter of law."
*Retail Servs., Inc.*, 364 F.3d at 542 (internal quotation marks omitted); *see* European Consortiums' Br. 28-30 (citing *Retail Services*).
Here, the one-sided, "overwhelming evidence" of genericness justified summary judgment. JA 1889. The European Consortiums do not dispute the accuracy of any of the underlying evidence, and they do not identify any particular factual issues that require a bench trial.

The European Consortiums contend that this case is unlike *Retail Services* for two reasons: the evidence in that case was "one-sided," and the term at issue in that case ("freebies") "was in common use long before the plaintiff claimed it as a trademark." Br. 29-30. But both are true here as well. The district court recounted the "overwhelming" and "one-sided" evidence establishing genericness, JA 1884, and the FDA standard of identity treated "gruyere" as generic well before the European Consortiums' claimed first use, *compare* JA 1890 (1977 standard of identity), *with* JA 383 (claimed first use in 1982 and use in commerce in 1985). Besides, whether sum-

mary judgment is appropriate depends on the evidence in the record in a particular case. So even if there are factual differences between this case and *Retail Services*, that does not make summary judgment inappropriate; it just reflects the fact that different cases have different facts.

The European Consortiums have had many opportunities to adduce evidence to create a fact issue. There was full discovery and a trial before the TTAB. The U.S. Dairy Groups submitted more types of evidence, and a greater volume of evidence, indicative of consumer perceptions than the Consortiums. *Compare* JA 42-60, JA 67-68 (U.S. Dairy Groups' TTAB evidence), *with* JA 60-64 (European Consortiums' TTAB evidence). Based on that evidence, the TTAB had "no doubt" that the term "gruyere" is generic. JA 77.

The European Consortiums then had the opportunity to develop additional evidence in a *de novo* proceeding in district court. But they did not provide any significant new evidence, instead relying primarily on the TTAB record and a few online definitions. JA 1903 ("Significantly, plaintiffs have not introduced new common usage evidence to augment the record presented to the TTAB."); *see*

58

JA 1663-1675, JA 1737-1740, JA 1758-1765, JA 1775-1777 (Consortiums' limited additional evidence). The U.S. Dairy Groups, by contrast, offered significant additional evidence, which reinforced the TTAB record and decision. *Compare* JA 13-77 (TTAB decision), *with* JA 120-1593, JA 1780-1785, JA 1790-1873 (U.S. Dairy Groups' evidence).

Even now, the European Consortiums' brief does not identify any genuine issues of material fact for trial. Instead, it incorrectly suggests that the district court failed to view the evidence "in the light most favorable" to the Consortiums, Br. 23, 26, 31, 44, 45, 49, 50, and vaguely asserts that a genuine issue of material fact exists, *id.* at 28-31, 47, 53. But nowhere does the brief identify *which* evidence supports the Consortiums or *what* genuine issue of material fact exists. The most the Consortiums say is that the ultimate question—whether "gruyere" is generic—is disputed. Br. 8, 22.

The Consortiums also claim that the district court "conceded that genuine issues of fact existed," Br. 31, but that is incorrect. The district court clearly concluded that the Consortiums "have failed to show that any triable issue of fact exists" because all they

59

provided was "mere conclusory denials" and "unsupported asser-

tions."  JA 1901.  There is thus no reason to disturb the district

court's summary judgment holding here.

## CONCLUSION

The Court should affirm the judgment of the district court.

Respectfully submitted,

s/ *Brian G. Gilpin*

| | |
|---|---|
| Nicole A. Saharsky | Brian G. Gilpin |
| MAYER BROWN LLP | Zachary R. Willenbrink |
| 1999 K Street NW | GODFREY & KAHN, S.C. |
| Washington, DC 20006 | 833 East Michigan Street, |
| (202) 263-3000 |  Suite 1800 |
| | Milwaukee, WI 53202 |
| | (414) 273-3500 |
| | |
| | Jennifer L. Gregor |
| | GODFREY & KAHN, S.C. |
| | One East Main Street, Suite 500 |
| | Madison, WI 53703 |
| | (608) 257-3911 |

June 21, 2022

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully submit that oral argument is not necessary in this case because the district court applied settled law to the undisputed historical facts in this case, and the evidence overwhelmingly establishes that the proposed mark is generic and therefore cannot be registered as a certification mark under 15 U.S.C. § 1054.

61

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

Complies with the type-volume limit of Rule 32(a)(7)(b)(i) because it contains 10,972 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

Complies with the typeface requirements of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (including serifs) using Word for Microsoft 365 and is set in Century Schoolbook font, size 14 points.

Dated: June 21, 2022                    s/ *Brian G. Gilpin*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on June 21, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  June 21, 2022                    s/ *Brian G. Gilpin*