CASE NO. 22-1041

IN THE

# United States Court of Appeals

### FOR THE FOURTH CIRCUIT

_____

INTERPROFESSION DU GRUYÈRE and SYNDICAT
INTERPROFESSIONEL DU GRUYÈRE,
*Appellants*,
v.
UNITED STATES DAIRY EXPORT COUNCIL, ATALANTA
CORPORATION, AND INTERCIBUS INCORPORATED,
*Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA – ALEXANDRIA DIVISION
Civil Action No. 1:20-cv-1174

_____

## REPLY BRIEF FOR APPELLANTS

_____

Richard Lehv                    Carl E. Jennison
Daniel M. Nuzzaci               John N. Jennison
FROSS ZELNICK LEHRMAN           JENNISON & SHULTZ, P.C.
 & ZISSU, P.C.                  3918 Prosperity Avenue
151 West 42nd Street, 17th Floor   Suite 215
New York, New York 10036        Fairfax, Virginia 22031
Tel: (212) 813-5900             Tel: (703) 415-1640

*Counsel for Appellants*

August 2, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................4

PRELIMINARY STATEMENT................................................................6

ARGUMENT ...........................................................................................8

I. DEFENDANTS FALSELY CLAIM PLAINTIFFS FAILED TO
DISPUTE ALLEGED FACTS.................................................................9

II. THE COURT BELOW IMPROPERLY MADE FACTUAL
FINDINGS, WHICH WERE CLEARLY ERRONEOUS ......................13

A.  Findings of fact concerning labelling of "process cheese." ............................ 14

B.  Findings of fact concerning Roth .................................................... 19

C.  Findings of fact concerning consumer perception of labels............................20

D.  The "majority understanding" rule is not "magic words" ............................... 23

III. DEFENDANTS CITE NO CASE IN WHICH A COURT
GRANTED SUMMARY JUDGMENT WHERE A MARK
WAS ALLEGED TO HAVE BECOME GENERIC OVER
TIME ....................................................................................................25

A. Defendants ignore this court's distinction between terms that
were in common use "before the association with products at
issue" and marks alleged to have become generic over time ................................25

B. Defendants do not dispute that a survey is the "preferred
method of proving genericness," yet they offer no excuse for
failing to provide this evidence.................................................................27

IV. THE DISTRICT COURT ERRED IN RELYING ON FDA
STANDARDS AND THE USPTO EXAM GUIDE
V. DEFENDANTS CONCEDE THAT DICTIONARY AND
OTHER EVIDENCE IS NOT "ONE-SIDED," AS THE
COURT BELOW WRONGLY FOUND ..............................................30

CONCLUSION ....................................................................................................32

REQUEST FOR ORAL ARGUMENT....................................................................34

CERTIFICATE OF COMPLIANCE .......................................................................35

## TABLE OF AUTHORITIES

## CASES

*America Online, Inc. v. AT & T Corp.*,
    243 F.3d 812 (4th Cir. 2001)................................................................26

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................9

*Beacon Enterprises, Inc. v. Menzies*,
    715 F.2d 757 (2d Cir. 1983) ...............................................................21

*BellSouth Corp. v. DataNational Corp.*,
    60 F.3d 1565 (Fed. Cir. 1995)............................................................28

*Booking.com B.V. v. United States Patent & Trademark Office*,
    915 F.3d 171 (4th Cir. 2019).....................................................8, 26, 27

*Colt Defense LLC v. Bushmaster Firearms, Inc.*,
    486 F.3d 701 (1st Cir. 2007) ..............................................................29

*Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc.*,
    690 F. Supp. 1457 (D. Md. 1988) .......................................................28

*Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc.*,
    870 F.2d 654 (4th Cir. 1989).........................................................26, 28

*In re Cooperativa Produttori Latte E Fontina Valle D'Aosta*,
    230 U.S.P.Q. 131 (T.T.A.B. 1986) .....................................................29

*Dulaney v. Packaging Corp. of America*,
    673 F.3d 323 (4th Cir. 2012)..............................................................22

*F.T.C. v. Dalbey*,
    11-CV-1396 (RBJ)(KLM), 2013 WL 934986 (D. Colo. Mar. 11, 2013) ..........21

*F.T.C. v. Millennium Telecard, Inc.*,
    11-CV-2479 (JLL), 2011 WL 2745963 (D.N.J. July 12, 2011).........................22

*Gimix, Inc. v. JS&A Group, Inc.*,
    213 U.S.P.Q. 1005 (N.D. Ill. 1982).....................................................29

*Gimix, Inc. v. JS & A Group, Inc.*,
    699 F.2d 901 (7th Cir. 1983)..............................................................29

*Hickory Farms, Inc. v. Snackmasters, Inc.*,
  509 F. Supp. 2d 716 (N.D. Ill. 2007) ...............................................29

*In re Hikari Sales USA, Inc.*,
  Ser. No. 86439012, 2019 WL 1453259 (T.T.A.B. Mar. 29, 2019) ....................29

*Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.*,
  240 F.3d 251 (4th Cir. 2001)...........................................................28

*King-Seely Thermos Co. v. Aladdin Industries, Inc.*,
  321 F.2d 577 (2d Cir. 1963) ...........................................................24

*McMeekan v. LeFever*,
  88-CV-0378 (RHB), 1990 WL 369723 (W.D. Mich. May 17, 1990) ...............21

*Nartron Corp. v. STMicroelectronics, Inc.*,
  305 F.3d 397 (6th Cir. 2002)..........................................................29

*POM Wonderful LLC v. Coca Cola Co.*,
  573 U.S. 102 (2014).....................................................................31

*Retail Services, Inc. v. Freebies Publishing*,
  364 F.3d 535 (4th Cir. 2004) ..........................................................26

*Royal Crown Co. v. Coca-Cola Co.*,
  892 F.3d 1358 (Fed. Cir. 2018) ...................................................26, 29

*United States Patent and Trademark Office v. Booking.com B.V.*,
  140 S. Ct. 2298 (2020)..............................................................8, 26

## STATUTE

15 U.S.C. § 1064(3) .........................................................................23

## REGULATION

21 C.F.R. § 133.169 .........................................................................15

## TREATISE

J. Thomas McCarthy,
  *McCarthy on Trademarks and Unfair Competition* (5th ed. 2022)........24, 27, 29

## MISCELLANEOUS

USPTO Exam Guide 2-20 (May 2020) ................................................31

## PRELIMINARY STATEMENT

Defendants had the burden of showing that (1) the majority of consumers believe GRUYÈRE is a "type of cheese" that can be made anywhere, as opposed to a cheese from the Gruyere region in Switzerland and France, *and* (2) there is no factual dispute as to what a majority of consumers believe. Defendants failed on both counts.

*First*, Defendants failed to prove that a majority of consumers understand GRUYÈRE as generic. Defendants do not dispute that a survey is the "preferred method of proving genericness," yet they offer no excuse for failing to provide one. Defendants not only failed to produce a survey, but also offered no consumer testimony.

Defendants now attempt to walk back their prior acknowledgement of the "majority understanding" rule – but that is the law, and they cannot avoid it.

*Second*, Defendants failed to establish the absence of any factual dispute as to what a majority of consumers believe. Defendants' repeated incantation of "undisputed" facts is just wrong. Bizarrely, Defendants go so far as to claim that, in the court below, Plaintiffs failed to list the disputed facts.  In truth, Plaintiffs expressly, and in great detail, did precisely that.

Defendants cannot even meet the alternative – and incorrect – test they proposed, JA 1779, namely that the majority of cheese sold in the U.S. under the GRUYÈRE name is from countries other than Switzerland and France.

As to imported cheese, Defendants do not point to any evidence to support the district court's findings that in the past decade "the majority of *GRUYÈRE-labeled* cheese imported into the United States was imported from the Netherlands and Germany" and that "Tens of thousands of kilograms of cheese *labeled GRUYÈRE* were also imported into the United States from Austria, Italy, Egypt, and the Czech Republic." JA 1893-94 (emphasis added). Those findings are not merely unsupported, but flatly wrong.

As to domestic cheese, Defendants do not point to any evidence to refute our showing that Emmi Roth ("Roth") has not sold any Wisconsin-made cheese under the name GRUYÈRE ***since May 1, 2013, over nine years ago***.[1] JA 934. Thus, the court below erred in finding that Roth continues to use the term GRUYÈRE on cheese made in Wisconsin.

In short, Defendants' Response tries to obscure and avoid key issues, while endlessly repeating the district court's erroneous factual findings – pretending they are "undisputed" – and attempting to buttress them with outright falsehoods.

---

[1] Roth imports and sells genuine GRUYÈRE cheese made in Switzerland by its parent company, Emmi.

# ARGUMENT

In their argument that genericness "can be decided on summary judgment," Response at 29, Defendants ignore the distinction this court made in *Booking.com B.V. v. United States Patent & Trademark Office*, 915 F.3d 171 (4th Cir. 2019), between a term that was "commonly used prior to its association with the products at issue" and a trademark that allegedly "had become generic through common usage." *Id.* at 183 (citation omitted). Defendants likewise ignore the Supreme Court's warning in *United States Patent and Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2307 n.6 (2020), that "difficult questions may be presented when a term has multiple concurrent meanings to consumers or a meaning that has changed over time."

All parties and the court below agree that GRUYÈRE did not originate as a "commonly used" term, but as an indication of geographic origin for cheese made in the GRUYÈRE region of Switzerland and France. Response at 7 ("gruyere originated in a certain region of Switzerland and France centuries ago"); JA 1878 ("**GRUYERE** cheese production dates to at least 1115 AD"); JA 1905 ("**GRUYERE** may have in the past referred exclusively to cheese from Switzerland and France"). Defendants cite no case in which this court granted summary judgment on genericness of a mark that was not initially generic, but

allegedly became generic over time (let alone a case in which the probative

evidence of genericness was as doubtful as here).

Further, Defendants fail to acknowledge that on summary judgment a court

cannot find facts or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986) ("at the summary judgment stage the judge's function is not

himself to weigh the evidence"). Because the public's understanding of the term

GRUYÈRE – the paramount factual issue in this case – is in dispute, summary

judgment was not permissible.

## I. DEFENDANTS FALSELY CLAIM PLAINTIFFS FAILED TO DISPUTE ALLEGED FACTS.

Defendants claim that Plaintiffs "filed a brief opposing summary judgment,

which did not include the required section listing any material disputed facts," and

that, "In light of [Plaintiffs'] failure to dispute any material facts below, they

cannot now credibly claim that the district court erred by finding facts." Response

at 33. It is incomprehensible how Defendants could make this claim. Item IV in

Plaintiffs' summary judgment memorandum (ECF No. 86, pp. 26-30) is our

"Statement of Controverted Facts." It responds to each item in Defendants'

statement of allegedly "Undisputed Material Facts." For example, in Paragraph 7

of their statement, Defendants claimed that "processed gruyere products continue

to be imported from many locations." (ECF No. 63, p. 3). In response, Plaintiffs

said that, *inter alia*, no witness testified as to the meaning of the USDA data and that the data "provides no information as to the purpose for which the processed cheese was used. It may have been used as an ingredient in other foods. There is no evidence that the processed cheese was sold to the general public or labeled as GRUYÈRE." (ECF No. 86, p. 27).

Not only did Plaintiffs refute Defendants' allegedly undisputed facts, but also Plaintiffs provided a "Statement of Facts in Dispute." (ECF No. 86, pp. 25-26). This asserts that genericness of GRUYÈRE is a disputed fact. Significantly, Defendants had not claimed in their statement of "Undisputed Material Facts" that genericness of GRUYÈRE is an undisputed fact.

Defendants also falsely claim that, in the court below, Plaintiffs "provided very little evidence of their own," and "simply rehashed arguments about [Defendants'] evidence." Response at 24. But Defendants had the burden of proof, which they failed to meet. Moreover, Defendants know that Plaintiffs submitted below an enormous amount of evidence they had previously submitted to the TTAB, including:

- Genuine GRUYÈRE cheese from Switzerland vastly outsells in the U.S. so-called "Gruyere" cheese produced outside of Switzerland and France, like Boar's Head BLANC GRUE. Appellants' Brief at 41.

- Roth stopped using "Gruyere" in 2013. JA 1706.

- Artisanal cheese makers in the U.S. do not use the name "Gruyere." Appellants' Brief at 13-15.

- Ammerlander, a German cheesemaker, stopped using GRUYÈRE, as did the Wisconsin Milk Marketing Board. JA 1670; JA 1716; JA 1718.

- In the entire Whole Foods chain and website, and in such specialty stores as Balducci's and Fairway Market, and in countless other food outlets, the only cheese sold bearing the GRUYÈRE mark is genuine Swiss GRUYÈRE cheese. Appellants' Brief at 15-16.

- The Encyclopedia Britannica defines GRUYÈRE as "Gruyère, hard cow's-milk cheese produced in the vicinity of La Gruyère in southern Switzerland and in the Alpine Comté and Savoie regions of eastern France." JA 1759.

- The comprehensive *Oxford Companion to Cheese* states that GRUYÈRE is an *Appellation of Origine Controlée*, for "a cheese from Switzerland," JA 1766-74, the best of which "are widely considered among the greatest of all cheeses."

Defendants know that Plaintiffs submitted, *inter alia*, the following new evidence to the district court that the TTAB did not have:

- Deposition testimony taken in the district court from Roth that Roth does not use GRUYÈRE on its own Roth-branded cheese or on cheese it sells in bulk

to supermarkets and others. Instead, it calls the cheese GRAND CRU, and has done so since 2013. JA 934.

- Testimony from Roth that it does not sell its GRAND CRU cheese in bulk only to supermarkets for "private labelling," as Defendants claimed. Roth sells a substantial portion of its GRAND CRU cheese to food service customers, such as restaurants, cafeterias, and country clubs that may use no name on the cheese. JA 1897; JA 1842.

- A letter from Roth to Wegmans confirming that Roth uses the name GRAND CRU – not "Gruyere" – on the cheese it sells to Wegmans. JA 990.

- Testimony from Wegmans that GRUYÈRE cheese from Switzerland outsells Wisconsin "Gruyere" in Wegmans stores. JA 947; JA 966.

- Testimony from the Wisconsin Milk Marketing Board ("WMMB") that, contrary to Defendants' claim that "many" cheesemakers make domestic "Gruyere," Response at 1, "very few" U.S. manufacturers make such cheese. The WMMB witness could name only one, Roth, which has not used the name GRUYÈRE since 2013. JA 1282; JA 1284-85.

Further, despite knowing that, as a result of Plaintiffs' efforts, Roth and others stopped using "Gruyere," Defendants falsely claim that Plaintiffs' efforts to stop unauthorized use of "Gruyere" "were largely unsuccessful." Response at 51. This appears to be an attempt to revive Defendants' "lack of control" argument, which

the court below did not reach and which Defendants waived on appeal. In any event, not only did Roth – the largest maker of cheese formerly called "Gruyere" – stop using GRUYÈRE, but so did Ammerland, a German producer, as well as numerous U.S. retail supermarkets. Appellants' Brief at 15-16.

Defendants also claim that "the French Consortium did nothing at all" to stop generic use. Response at 51. Under an agreement, Plaintiffs collaborate on enforcement, JA 497-98, and have allocated responsibility for U.S. enforcement to the Swiss Plaintiff. Finally, Defendants falsely claim that the Swiss Plaintiff "expressly permitted [Roth] to continue allowing its customers to label [Roth] cheese as 'gruyere.'" Response at 51. The Swiss Plaintiff did not permit Roth to do anything, and, since Roth does not own the GRUYÈRE mark, it could neither permit nor prohibit customers from using that mark. Plaintiffs, however, have objected to Roth's customers' use of the mark.

## II. THE COURT BELOW IMPROPERLY MADE FACTUAL FINDINGS, WHICH WERE CLEARLY ERRONEOUS.

Defendants assert that the court below did not make any findings of fact and relied only on "undisputed" evidence. (Response at 3, 7, 30, 31, 32, 34, 35, 38, 39, and 57). The district court's own words disprove this. First, the court made a finding on the ultimate, hotly disputed fact issue, when it said that "**GRUYERE**

has now, over time, become generic." JA 1888. Further, the court made findings on subsidiary fact issues.

**A. Findings of fact concerning labelling of "process cheese."**

In the court below, Defendants undertook to prove that "the majority of gruyere encountered by the public in the U.S. is not from Switzerland or France." JA 1779. Of course, this is not the correct test of genericness. As we showed in our main brief, pp. 45-46, genericness depends not on a comparison of product quantities, but on what a majority of consumers believe.

On the issue of product quantities, the court below made these findings of fact:

- "[F]rom 2010-2020, the majority of ***GRUYERE***-*labeled* cheese imported into the United States was imported from the Netherlands and Germany, not from Switzerland and France." JA 1893 (emphasis added).

- "Tens of thousands of kilograms of cheese *labeled **GRUYERE*** were also imported into the United States from Austria, Italy, Egypt, and the Czech Republic during this time period." JA 1893-94 (emphasis added).

- "[T]he Court would find the following facts from the factual record . . . The record evidence shows that more than five million pounds of **GRUYERE** cheese produced outside the Gruyère region of Switzerland

and France were sold in the United States in each year from 2016 to 2020."[2] JA 1885-86.

- "[M]illions of pounds of domestic produced cheese are sold as **GRUYERE**." JA 1896.

- "[T]he evidence provided by defendants, which includes import data showing the bulk of imported GRUYERE comes from outside Switzerland and France, as well as sales data showing substantial sales of GRUYERE produced in the United States, demonstrates that Swiss and French GRUYERE certainly do not dominate the market." JA 1900-01.

All the foregoing are findings of fact, and all are erroneous.

These errors proceeded from a clearly erroneous conflation of two distinct product categories: "cheese" and "process cheese." Under FDA regulations, "Process cheese" includes emulsifiers and other additives and may be a blend of cheeses. 21 C.F.R. § 133.169. The product Plaintiffs certify in Switzerland and France is "cheese," not "process cheese," because it does not include emulsifiers or other additives and is not a blend of cheeses. Roth's GRAND CRU also is "cheese," not "process cheese."

---

[2] Defendants claim the court's use of the phrase "would find" is nothing more than a statement that "even if it held a bench trial, the European Consortiums would lose on the issue of genericness." Response at 23. But earlier in its opinion, even before the court used the phrase "would find," it made numerous erroneous factual findings.

Defendants' USDA import data concerns quantities of "process cheese" under tariff categories nos. 04063051 and 04063053, which categories are described as "Gruyere-Process Cheese, Processed, Not Grated or Powdered." USDA does not say that any of this "process cheese" is labeled GRUYÈRE, and in the court below Defendants did not claim this "process cheese" is labelled GRUYÈRE and with one exception did not submit any labels for this imported "process cheese."[3] Moreover, no witness explained the meaning of the phrase "Gruyere-Process," or explained how this process cheese is used, to whom it is sold, or how it is labelled, if it is labelled at all. The court below jumped to the conclusion that all this process cheese is "labeled GRUYÈRE."

In their Response, Defendants do not show that this process cheese was "labeled GRUYÈRE," let alone show how consumers understand the geographic origin of this process cheese, thus tacitly conceding that the court below was wrong.

Moreover, Defendants double down on this bogus claim about "process cheese," falsely asserting it is "undisputed." Response at 7 (claiming it is "undisputed" that the U.S. imports millions of kilograms "of gruyere" from the Netherlands); 35 (claiming it is "undisputed" that "the majority of **GRUYERE**-

---

[3] Defendants submitted a label for Boar's Head Hickory Smoked GRUYÈRE, Response at 10.

labeled cheese imported into the United States was imported from the Netherlands and Germany, not from Switzerland or France"); 38 (claiming the USDA data "plainly refers to the gruyere style of cheese, and the data in the table is backed up by examples of actual labels used to sell the cheese in the United States"); *see also* Response at 3, 30, 31, 32, 34, 39, and 57 (claiming evidence is "undisputed"). These claims are blatantly wrong.

Since Defendants are unable to point to any "GRUYÈRE labels" for process cheese from Netherlands, Austria, Italy, Egypt, and the Czech Republic, let alone labels used on "millions of pounds" of process cheese, the court's finding was nothing more than speculation. Moreover, on summary judgment the court was required to draw all reasonable inferences in Plaintiffs' favor.  Here, a reasonable inference is that the process cheese is sold under a brand like "The Laughing Cow" or "Président Gourmet" or another European brand sold in American supermarkets that does not use GRUYÈRE in the name.

The district court's finding that "the majority of *GRUYÈRE-labeled* cheese" imported into the United States was imported from the Netherlands and Germany" is erroneous because it includes process cheese, and Defendants have not shown how that process cheese is labelled. Similarly, the district court's finding that "more than five million pounds of **GRUYÈRE** cheese produced outside the

Gruyère region of Switzerland and France were sold in the United States in each year from 2016 to 2020" is erroneous, because it includes this process cheese.

The majority of GRUYÈRE cheese sold in the United States *is* from Switzerland and France. U.S. imports of genuine GRUYÈRE cheese from Switzerland in 2020 were over 7,700,000 pounds, JA 1872, plus a lesser amount from France. JA 1873. In contrast, Defendants claim that consumers "routinely encounter" eight Gruyère-branded products not made in Switzerland or France, which they claim are "widely available," and whose labels are shown at Response pp. 10-11. But Defendants offer no evidence that all these products are "widely available" or that consumers "routinely encounter" them. Defendants provide sales figures only for the two Boar's Head products and the Dietz & Watson and Wegmans products. JA 966; JA 1814; JA 1825. Total sales of genuine Swiss and French GRUYÈRE are almost *six times* the aggregate sales of those four products. Moreover, Wegmans admitted that in the last two years GRUYÈRE from Switzerland has outsold Wisconsin "Gruyère" in Wegmans stores. JA 947; JA 966. It is reasonable to assume this pattern holds true in other supermarkets that carry both GRUYÈRE from Switzerland and "Gruyere" from Wisconsin.[4]

---

[4] Although Defendants claim that "many U.S. cheesemakers . . . produce gruyere" (Response at 1, 8, 39) they have identified only two, and one is Roth, which has not used GRUYÈRE since 2013.

**B. Findings of fact concerning Roth**

Given that Roth has not sold any Wisconsin-made cheese under the name
GRUYÈRE *since May 1, 2013, over nine years ago*, JA 934, the court below erred
when it said, "Roth has sold more than 2 million pounds of [Wisconsin-made]
private label cheese every year from 2014 to 2020, with the volume of private label
**GRUYERE** exceeding 4 million pounds in 2018 alone." JA 1897.  It erred when it
said "food service providers – who Plaintiffs allege purchase **GRUYERE** cheese
en masse – are part of the 'relevant purchasing public' whose understanding of the
term **GRUYERE** is central to the analysis in this case." JA 1898 n.6. Food service
providers do not "purchase **GRUYERE** cheese" from Roth, they purchase
GRAND CRU cheese. Defendants ignore these facts in their Response, again
tacitly conceding that the court below erred.

Moreover, even though Defendants know that Roth has not used the name
GRUYÈRE since 2013, they repeatedly claim that Roth continues to use the name
GRUYÈRE. Response at 8 ("Roth sells some of its gruyere through its house brand
and sells the rest to retailers that 'private label' the cheese."); 9 ("In the years since
[2013], [Roth] has sold significant amounts of its Wisconsin-made gruyere to
grocery stores. . . . Gruyere made in the United States by [Roth] . . . is offered to
consumers in hundreds of restaurants and supermarkets."), 32 n.3 ("Roth has
produced gruyere in Wisconsin for decades and sells millions of pounds . . .

annually'); 39 (Roth and another company "are producing gruyere in the United

States and selling it in the United States labeled as 'gruyere' . . . . Over the past

decade those cheesemakers have produced well over 10 million pounds of gruyere

in the United States."); 39 ("Wegmans sells Emmi Roth's Wisconsin-made

gruyere"); 40 ("Roth has been producing gruyere in Wisconsin since the 1980s");

41 (referring to Roth's "Wisconsin-produced, private label gruyere").

**C. Findings of fact concerning consumer perception of labels.**

Since Defendants have framed the issue as to what consumers "routinely

encounter," we note that the Boar's Head products and other products are not

clearly labelled with the country of origin. On packaging for those products, the

country of origin appears only in small letters or only on the back of the package or

both. Consumers' understanding of the country of origin is a disputed fact issue.

We argued in the court below that Boar's Head disguises the Wisconsin origin of

its BLANC GRUE product, by giving it a French name and claiming it is a

"Traditional Old World Alpine" product, as follows:



The court below improperly made a finding of fact, saying the label "prominently display[s] the cheese's Wisconsin origins." JA 1899. "Prominently" means "in a way that stands out so as to be easily seen; noticeably or conspicuously" (https://www.dictionary.com/browse/prominently); "readily noticeable : CONSPICUOUS" (https://www.merriam-webster.com/dictionary/prominent). Courts have made clear that whether a designation like "Wisconsin Cheese" is "prominently displayed" is a question of fact.[5] The district

---

[5] *See Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 767-68 (2d Cir. 1983) (reversing summary judgment based, in part, on defendant's "legitimate objection to district court's factfindings," including that the "Saunette Suit is always sold with a Beacon label prominently displayed."); *McMeekan v. LeFever*, 88-CV-0378 (RHB), 1990 WL 369723, at *2 (W.D. Mich. May 17, 1990) (impact of label on consumer behavior "implicate[] questions of fact which preclude summary judgment at this time."); *F.T.C. v. Dalbey*, 11-CV-1396 (RBJ)(KLM), 2013 WL 934986, at *2 (D. Colo. Mar. 11, 2013) (denying summary judgment; "the Court

court's finding of fact is directly contrary to the rules that a court may not make

factual findings on summary judgment and must draw all reasonable inferences

and view all evidence "in the light most favorable to the non-moving party."

*Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 324 (4th Cir. 2012).

Similarly, Wegmans offers its customers "intense," "medium," and "mild"

GRUYÈRE cheese; all bear similar labels and all print the name GRUYÈRE in the

typeface used in the LE GRUYÈRE certification mark Registration, as follows:



JA 967, 969, 971. The court below found that the Wegmans label "prominently

display[s]" the cheese's Wisconsin origin. JA 1899. But how many customers

realize that although the "intense" and "medium" versions come from Switzerland,

---

wishes to hear testimony about the [prominence and conspicuousness of the]
disclaimers from defendants and from consumers."); *F.T.C. v. Millennium
Telecard, Inc.*, 11-CV-2479 (JLL), 2011 WL 2745963, at *6 (D.N.J. July 12, 2011)
(determinations about "whether such disclaimers are sufficiently prominent and
unambiguous" requires court to make findings of fact).

the "mild" version comes from Wisconsin? Whether MADE IN WISCONSIN is sufficiently prominent to affect consumer awareness is a disputed issue of fact. On summary judgment, the court was not permitted to decide this disputed issue, especially when it was required to view the evidence in the light most favorable to Plaintiffs.[6]

## D. The "majority understanding" rule is not "magic words"

Knowing that they cannot show that the majority of cheese comes from sources outside Switzerland and France and hence cannot meet the burden of proof they assumed, Defendants now claim that a finding as to the understanding of "a majority of the relevant public" is unnecessary, and that the court below did not have "to use special 'magic words' to find genericness." Response at 25, 56.

But Defendants themselves said in the district court, "Under the correct standard—the primary significance standard—majority usage controls." JA 1779. They conceded they must show that "a majority of the relevant public understand a term as a generic product type." *Id.* The necessity of finding what "a majority of the relevant public" understands is not a matter of "special 'magic words,'" but rather derives directly from Section 14 of the Trademark Act, 15 U.S.C. § 1064(3),

---

[6] Similarly, the Trader Joe's label does not clearly disclose its Wisconsin origin. A customer thought it was "a Swiss Gruyere aged at least six months." JA 1753-54.

which states that genericness depends on the "primary significance of the

registered mark to relevant public." As Professor McCarthy explains:

> If some people regard the contested designation as a
> generic term, while others regard it as a mark, the term
> must be placed in either the "generic" pigeonhole or the
> "trademark" category. The result of the primary
> significance rule is that majority usage controls.

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:6

(5th ed. 2022) ("*McCarthy*"), citing *King-Seely Thermos Co. v. Aladdin Indus.,*

*Inc.*, 321 F.2d 577, 580 (2d Cir. 1963) ("a substantial majority").

The court below found that "some individuals understand **GRUYERE** to have

an association with Switzerland." JA 1904. Neither Defendants nor the court below

have any basis for concluding that "some individuals" are a mere minority.

The straightforward way for Defendants to have met their burden of proof on

majority usage is through a consumer survey. For whatever reason, Defendants

chose not to offer a survey. Instead, they tried to meet their burden by comparing

product quantities, JA 1779, even though no case supports this theory. Now that

Plaintiffs have shown that the majority of GRUYÈRE cheese sold in the U.S. is

imported from Switzerland and France, Defendants reverse themselves, saying,

"[G]enericness does not turn on a simple comparison of the amounts produced

inside versus outside of Switzerland and France." Response at 41. They also say

they are not required to show what a "majority of consumers" believe, because

those are just "magic words." The shifting sands of Defendants' argument confirm

that they have no framework for deciding the issue of genericness. In sum,

Defendants do not know how a majority of consumers understand the term

GRUYÈRE, the court below made no finding on this issue, and on summary

judgment the court could not permissibly have done so.[7]

## III. DEFENDANTS CITE NO CASE IN WHICH A COURT GRANTED SUMMARY JUDGMENT WHERE A MARK WAS ALLEGED TO HAVE BECOME GENERIC OVER TIME.

Defendants have not cited any precedent that would permit or support the

granting of summary judgment on this disputed record.

### A. Defendants ignore this court's distinction between terms that were in common use "before the

---

[7] Defendants say that Plaintiffs did not submit a survey, but Plaintiff's have no burden of proof. The USPTO approved their certification mark application; by opposing that application, Defendants assumed the burden of proving that GRUYÈRE is generic. If Defendants are unable to meet that burden, the mark will be registered. Defendants also say that Plaintiffs "did not cross-move for summary judgment; they have never contended that the evidence of genericness is so one-sided as to support summary judgment in their favor." Response at 19. Defendants cite no case holding that a party must cross-move. If Defendants cannot meet their burden of showing no dispute as to material facts, summary judgment must be denied.

**association with products at issue" and marks alleged
to have become generic over time.**

In their argument that "genericness is an issue that can be decided on summary

judgment," Response at 29, Defendants ignore the distinction this court made in

*Booking.com B.V. v. United States Patent & Trademark Office*, 915 F.3d 171 (4th

Cir. 2019), between a term that was "commonly used prior to its association with

the products at issue" and a trademark that allegedly "had become generic through

common usage." *Id.* at 183. Defendants also do not mention the Supreme Court's

warning that "difficult questions may be presented when a term has multiple

concurrent meanings to consumers or a meaning that has changed over time." 140

S. Ct. at 2307 n.6. The summary judgment decisions Defendants cite all involve

terms that were "commonly used" before a company claimed them as a trademark.

*Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1363 (Fed. Cir. 2018) (ZERO

for soda with zero calories and zero sugar); *Retail Servs., Inc. v. Freebies Publ'g*,

364 F.3d 535, 546 (4th Cir. 2004), (FREEBIES for goods offered without charge);

*Am. Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 818-21 (4th Cir. 2001) ("You have

mail" for email alert); and *Convenient Food Mart, Inc. v. 6-Twelve Convenient

Mart, Inc.*, 870 F.2d 654 (4th Cir. 1989) (unpublished) (CONVENIENT for

convenience stores).

There is no evidence that GRUYÈRE was commonly used in the U.S. before

Plaintiffs started using it as a certification mark decades ago. GRUYÈRE cheese

has been made in the Gruyère region of Switzerland and France since before the

discovery of America. Response at 7 ("gruyere originated in a certain region of

Switzerland and France centuries ago"). Moreover, the court below acknowledged

that GRUYÈRE initially was non-generic. JA 1888 ("Although the term

**GRUYERE** may once have been understood to indicate an area of cheese

production . . . **GRUYERE** has now, over time, become generic to cheese

purchasers in the United States.").[8]

### B.  Defendants do not dispute that a survey is the "preferred method of proving genericness," yet they offer no excuse for failing to provide this evidence.

Not only do Defendants fail to cite a case in which this court granted summary

judgment where a mark allegedly became generic over time, but also Defendants

do not dispute that survey evidence is highly relevant in cases involving

trademarks that are alleged to have become generic over time. As this court said in

*Booking.com B.V.*, 915 F.3d at 183, consumer surveys are the "preferred method of

proving genericness" and, indeed, "almost *de rigueur*." 2 *McCarthy* § 12:14

("Judges are now used to survey evidence and often expect to receive evidentiary

---

[8] Defendants suggest that the FDA's adoption of the standard of identity in 1977 shows that GRUYÈRE was generic in 1977, Response at 57, but there is no evidence of the public's understanding of GRUYÈRE in 1977, and no evidence that the FDA had any knowledge of the public's understanding of the term in 1977 or at any other time.

assistance by surveys in resolving generic disputes. A litigant who alleges that a
designation is not a valid trademark because it is perceived as a generic name of a
product or service and does not introduce a survey to support this challenge may be
viewed as less than serious by some judges").

All the decisions Defendants cite in which a court found a mark generic without
survey evidence involved commonly used terms. In *Hunt Masters, Inc. v. Landry's
Seafood Restaurant, Inc.*, 240 F.3d 251, 255 (4th Cir. 2001), Response at 52-53,
this Court held that "crab house" was in common use for a type of restaurant
before the plaintiff began using it. *Hunt Masters* made the distinction between
terms that were always generic and terms that became generic, quoted in
*Booking.com*.

In *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1570 (Fed. Cir. 1995),
Response at 52, the "Walking Fingers" logo was held generic because it was used
"by virtually all classified [telephone] directory publishers." The court said, "This
case is somewhat unusual because of the unique circumstances surrounding the
phone giant AT&T and its subsequent divestiture of operating companies." Thus,
the decision has no application here.

In a footnote, Response at 53, Defendants cite additional inapposite cases,
involving such commonly used terms as CONVENIENT for convenience stores,
*Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc*., 690 F. Supp. 1457,

1465 (D. Md. 1988), *aff'd*, 870 F.2d 654 (4th Cir. 1989), and BEEF STICK and

TURKEY STICK for snack foods, *Hickory Farms, Inc. v. Snackmasters, Inc.*, 509

F. Supp. 2d 716, 720 (N.D. Ill. 2007).[9]

Moreover, the court below found both that GRUYÈRE has multiple concurrent

meanings to consumers, JA 1904 ("some individuals understand **GRUYÈRE** to

have an association with Switzerland"), and that its meaning has changed over

time, JA 1904 ("no longer universally understood to indicate cheese produced in

the Gruyère region"). As Prof. McCarthy explains, in cases where there is

"evidence of both generic and non-generic usage of the disputed words or

designation, . . . the burden of proof becomes important and the decision-maker

must carefully weigh the evidence to determine the predominant usage and

significance of the designation." 2 *McCarthy* § 12:20. Here, Defendants had the

---

[9] Other cases Defendants cite are *Royal Crown Co.*, 892 F.3d at 1366  (ZERO);
*Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 704 (1st Cir. 2007)
(M4, a term the U.S. military designated for a compact version of the M16
carbine); *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 400 (6th Cir.
2002) (SMART POWER for "electrical power circuits"); *Gimix, Inc. v. JS&A
Grp., Inc.*, 213 U.S.P.Q. 1005, 1006 (N.D. Ill 1982), *aff'd sub nom. Gimix, Inc. v.
JS & A Grp., Inc.*, 699 F.2d 901 (7th Cir. 1983) (AUTO PAGE for automatic
telephone answer service connected to an automatic dialing device); *In re Hikari
Sales USA, Inc.*, Ser. No. 86439012, 2019 WL 1453259, at *3 (T.T.A.B. Mar. 29,
2019) (ALGAE WAFERS for fish food wafers made of algae); and *In re
Cooperativa Produttori Latte E Fontina Valle D'Aosta*, 230 U.S.P.Q 131, 132, 133
(T.T.A.B. 1986) ("applicant indicated that the word FONTINA can be translated to
English to mean 'very soft, tender.'" Applicant also admitted that "fontina" is a
"type of cheese.")

burden of proving not only that GRUYÈRE is generic, but also that there is no factual dispute on that issue.

## IV. THE DISTRICT COURT ERRED IN RELYING ON FDA STANDARDS AND THE USPTO EXAM GUIDE

In Plaintiffs' opening brief, we showed that the court below repeatedly – and incorrectly – said that an FDA Standard "permits" the use of GRUYÈRE on cheese made anywhere. JA 1890 (Standard "permits the use of term **GRUYERE** on cheese labels with no requirement about where that cheese is produced"). See also, JA 1889, JA 1890-91.

We showed that these statements demonstrate a fundamental misunderstanding of the Food Drug and Cosmetic Act and constitute reversible error. Appellants' Brief at 33-40. The FDA standards of identity do not "permit" anyone to use the term GRUYÈRE.

Defendants' Response never mentions, let alone defends, the district court's repeated – and erroneous – conclusion that the FDA regulations "permit" the use of GRUYÈRE. Thus, Defendants tacitly concede that that the court below erred on this significant point.

Defendants say that the FDA Standard "is not dispositive evidence" and they assert only that the FDA Standard is "relevant." Response at 46. But the FDA Standard is simply not probative on genericness. Appellants' Brief at 33-40.

Indeed, as Defendant concede, Response at 46, "Roquefort" is protected by the USPTO and by the courts even though it has an FDA standard of identity.

Defendants also wrongly claim that USPTO Examination Guide 2-20 applies here. Response at 45. The Exam Guide itself says that trademarks to which it applies "differ from certification and collective marks of regional origin, which are registrable under Trademark Act § 4, 15 U.S.C. § 1054." Section 4 provides that "collective and certification marks, including indications of regional origin, shall be registrable under this Act." As the Exam Guide itself says, "Certification and collective marks of regional origin refer to the place the products come from and the quality standards they meet." Further, the Exam Guide's reliance on FDA Standards is questionable under *POM Wonderful LLC v. Coca Cola Co*., 573 U.S. 102 (2014), given that FDA has no expertise on public perception of marks. Finally, the USPTO was aware of the FDA Standard, JA 419, yet found, based on substantial evidence, that GRUYÈRE was not generic. It approved Plaintiffs' application to register the GRUYÈRE certification mark.

## V. DEFENDANTS CONCEDE THAT DICTIONARY AND OTHER EVIDENCE IS NOT "ONE-SIDED," AS THE COURT BELOW WRONGLY FOUND.

Reviewing the dictionary definition evidence, Defendants concede that not all such evidence supports their position; some dictionaries, they concede, define GRUYÈRE "by reference to its geographic source" and, they concede, the

evidence provides "some support" for both sides. Response at 47-48.

(Significantly, they make these concessions while ignoring – as did the court below

– the comprehensive *Oxford Companion to Cheese*.) Defendants fail to explain

how the court below concluded that the dictionary evidence, "[v]iewed as whole,"

favors Defendants. The court engaged in some sort of weighing process, which is

impermissible on summary judgment. Given that Defendants offered this evidence

in place of survey evidence, which is preferred by the courts, Defendants utterly

failed to meet their burden of proof.

As for alleged generic uses of GRUYÈRE in media, Defendants tout old articles

that do not reflect current usage, such as "an internet list of 'ten best' gruyeres,

which lists gruyeres from multiple countries, including the United States and

Austria." Response at 52. But the list is at least nine years old, since it refers to

Roth's GRUYÈRE, a name Roth stopped using in 2013. JA 1076-1079.

## CONCLUSION

Defendants argue that "'gruyere' means a type of cheese, one that can be made

anywhere." Response at 1. "Gruyere," Defendants say, "generally is mild-flavored,

is comprised of at least 45% milkfat, and is at least 90 days old." Response at 7.

According to Defendants, nothing more is required. This "type of cheese" need not

taste anything like GRUYÈRE from Switzerland or France.

{F4737612.3 }                                              32

Defendants argue that protecting the GRUYÈRE certification mark would somehow "hurt . . . many U.S. grocery stores, restaurants, and other retailers" and "confuse . . . consumers." Response at 1. This ignores the purpose of a certification mark, which protects consumers, because it assures them that a product bearing the mark is painstakingly made in the GRUYÈRE region in Switzerland and France from local, natural ingredients using traditional methods that assure the connection between that region and the distinctive taste, texture, and aroma of the final product. In short, genuine GRUYÈRE cheese cannot "be made anywhere."

If Defendants have their way, cheese factories anywhere in the world would be able to call any bland, waxy, characterless, industrial product "Gruyere," even if it tastes nothing like the genuine cheese from Switzerland and France. That would confuse and harm consumers. And artisanal cheesemakers in the U.S. who believe they can make a cheese that is comparable to genuine GRUYÈRE from Switzerland or France have shown they have no need to use the term GRUYÈRE. Appellants' Brief at 13-15.

The certification mark Plaintiffs seek to protect is not, as Defendants argue, "exceptionally broad." Response at 21. Plaintiffs seek to protect a mark that certifies cheese made in a specific region in Switzerland and France. Indeed, virtually all certification marks of regional origin (that is, most certification

marks), are merely a geographic term. If that fact were a disqualification, hundreds of certification marks would never have been registered.

As for Defendants' argument that if Plaintiffs prevail "the word 'gruyere' . . . will be forced out of common use," Response at 1, Defendants fail to show that GRUYÈRE is in "common use" among a majority of consumers to mean "a type of cheese." At the end of their 60-page Response, Defendants are still no closer to showing how a majority of consumers understand the term GRUYÈRE than they were when they filed their summary judgment motion. Defendants failed to offer any evidence of consumer understanding – in the form of consumer testimony or a survey. Moreover, Defendants now tacitly concede that the district court's reliance on FDA standards was a misapplication of the law; just as they tacitly concede the district court's speculation about the labelling for "process cheese" was clearly erroneous. And Defendants now concede that the dictionary definitions support both sides. Defendants have failed to meet their burden of showing no genuine issue as to whether the majority of consumers view GRUYÈRE as a generic term. The decision below should be reversed.

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request oral argument, considering the importance of the issues presented by this appeal.

Respectfully submitted,

s/ Richard Lehv
Richard Lehv
FROSS ZELNICK LEHRMAN
 & ZISSU, P.C.
151 West 42nd Street, 17th Floor
New York, New York 10036
Tel: (212) 813-5900

## CERTIFICATE OF COMPLIANCE

This brief or other document complies with type-volume limits because,

excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover

page, disclosure statement, table of contents, table of citations, statement regarding

oral argument, signature block, certificates of counsel):

This brief or other document contains 6,380 words, based on the word count in

Microsoft Word, which was used to prepare this brief.

This brief complies with the typeface and type style requirements because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

in 14-point Times New Roman font.

(s) /Richard Lehv/
Party Name: Appellants
Dated: August 2, 2022.

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August 2022, the foregoing Brief of

Appellants was filed electronically and served on the following counsel of record

for Defendants, all of whom are registered CM/ECF users:

Brian G. Gilpin
Jennifer L. Gregor
Zachary R. Willenbrink
GODFREY & KHAN, S.C.
833 E. Michigan St., Suite 1800
Milwaukee, Wisconsin 53202
Tel: (414) 273-3500

Nicole A. Saharsky
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Tel: (202) 263-3000

<u>s/ Carl Jennison</u>
Carl Jennison
