**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1041

INTERPROFESSION DU GRUYERE; SYNDICAT INTERPROFESSIONNEL DU GRUYERE,

                    Plaintiffs – Appellants,

          v.

U. S. DAIRY EXPORT COUNCIL; ATALANTA CORPORATION; INTERCIBUS, INC.,

                    Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T. S. Ellis, III, Senior District Judge.  (1:20-cv-01174-TSE-TCB)

Argued:  December 9, 2022                    Decided:  March 3, 2023

Before GREGORY, Chief Judge, THACKER, and RUSHING, Circuit Judges.

Affirmed by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Thacker and Judge Rushing joined.

**ARGUED:**  Richard Zachary Lehv, FROSS ZELNICK LEHRMAN & ZISSU, P.C., New York, New York, for Appellants.  Nicole A. Saharsky, MAYER BROWN, LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  Daniel M. Nuzzaci, FROSS ZELNICK LEHRMAN & ZISSU, P.C., New York, New York; Carl E. Jennison, John N. Jennison, JENNISON & SHULTZ, P.C., Fairfax, Virginia, for Appellants.  Brian G. Gilpin, Zachary R. Willenbrink, Milwaukee, Wisconsin, Jennifer L. Gregor, GODFREY & KAHN, S.C., Madison, Wisconsin, for Appellees.

GREGORY, Chief Judge:

This case is about gruyere cheese—"widely considered among the greatest of all cheeses," according to the Oxford Companion to Cheese, J.A. 1771—and under what circumstances cheese can be labeled as such.   Appellants are a Swiss consortium, Interprofession du Gruyère ("IDG"), and a French consortium, Syndicat Interprofessionel du Gruyère ("SIG") (together, "the Consortiums"), who believe that gruyere[1] should only be used to label cheese that is produced in the Gruyère region of Switzerland and France.  Seeking to enforce this limitation in the United States, the Consortiums filed an application with the United States Patent and Trademark Office ("USPTO") to register the word "GRUYERE" as a certification mark.  Appellees, the U.S. Dairy Export Council, Atalanta Corporation, and Intercibus, Inc. (together, "the Opposers"), opposed this certification mark because they believe the term is generic and therefore ineligible for such protection.

The USPTO's Trademark Trial and Appeal Board ("TTAB") agreed with the Opposers and held that "GRUYERE" could not be registered as a certification mark because it is generic.  The Consortiums filed a complaint challenging the TTAB's decision in United States district court.  The district court granted summary judgment for the Opposers on the same grounds as articulated in the TTAB's decision.  This appeal followed.

---

[1] For consistency, when discussing the cheese generally, we refer to it as "gruyere." However, we recognize that it is often spelled with a grave accent over the first "e," or with a capitalized "g."  When discussing the sought-after certification mark, we refer to it as "GRUYERE."

Like a fine cheese, this case has matured and is ripe for our review.  For the reasons to follow, we conclude that the term "GRUYERE" is generic as a matter of law and affirm the decision of the district court.

I.

A.

Gruyere cheese originated in the district of La Gruyère in the Canton of Fribourg, Switzerland in 1115 AD.  The original area of production has since expanded to include other areas in Switzerland and neighboring areas of France.  In the Gruyère region of Switzerland and France, "producers make cheese from the unpasteurized milk of cows that graze on alpine grasses.  The resulting cheese goes through a rigorous aging and production process." J.A. 1878.  Switzerland and France have approved "Gruyère" as a protected designation of origin ("PDO") and a protected geographical indication ("PGI"), respectively.  As a general matter, PDO and PGI designations "guarantee that [a] food product originates in the specified region or follows a traditional production process."  J.A. 1743.  The PDO and PGI designations for "Gruyère" each set forth detailed requirements that dictate the process of gruyere production, including that the cheese be produced in specified areas of Switzerland (pursuant to the Swiss PDO) and France (pursuant to the French PGI).

Parallel protections do not exist in the United States.  While the Food and Drug Administration ("FDA") has issued a standard of identity for "Gruyere cheese," 21 C.F.R. § 133.149(a), which sets forth requirements that must be met for cheese to be labeled as such, *see* 21 U.S.C. § 343(g), those requirements are far less stringent than those governing

gruyere production in Switzerland and France.  For example, and as specifically relevant to this appeal, the FDA standard of identity does not impose any geographic restrictions as to where gruyere-labeled cheese can be produced.

As a result, cheese—regardless of its location of production—has been labeled and sold as gruyere in America for decades.  For example, starting in 1991, Roth Käse, an American cheesemaker, began producing cheese in Wisconsin that it labeled and sold as gruyere in the United States.  Roth Käse was subsequently acquired by a Swiss company, Emmi International Limited ("Emmi"), and became Emmi Roth USA ("Emmi Roth"). Emmi Roth sells cheese through its own house brand, as well as through private label sales to third-party retailers that sell Emmi Roth cheese under their own brands and labels. Pursuant to an agreement between Emmi and IDG, Emmi Roth stopped labeling its house brand cheese as gruyere in May 2013.  But this agreement only applies to Emmi Roth's house brand cheese; it does not preclude Emmi Roth's private label customers from labeling Emmi Roth cheese as gruyere.  Such private label sales are substantial; between 2014 and 2020, Emmi Roth sold approximately ███████████ pounds of its Wisconsin-produced cheese to its private label customers, and at least some of those private label customers resold Emmi Roth cheese as gruyere.  Indeed, the record demonstrates that in 2020, Boar's Head and Wegmans resold ██████ pounds of Emmi Roth cheese as gruyere.  And except for 2020, Wegmans sold more pounds of Emmi Roth cheese labeled as gruyere than it did Swiss-produced gruyere-labeled cheese each year between 2016 and 2021.

The record evidence demonstrates that numerous other retailers, including Kroger Company and Publix, have sold gruyere-labeled cheese that was produced in Wisconsin.

4

Additionally, a company called Glanbia Nutritionals ("Glanbia") produces gruyere cheese in Blackfoot, Idaho.  Glanbia sold over ███████ pounds of gruyere-labeled cheese in 2018 and 2019 and over █████ pounds in 2020.[2]

In addition to American-produced gruyere-labeled cheese, there is evidence that cheese has been imported from numerous countries and sold in the United States as gruyere.  Approximately seven million pounds of gruyere cheese were imported from Switzerland in 2020, and in 2016, almost 40,000 pounds of French gruyere cheese were sold in the United States.  But in addition to importation from Switzerland and France, United States Department of Agriculture ("USDA") data show that, at least since 1995, cheese has been imported to the United States under the category "Gruyere-Process Cheese, Processed, Not Grated or Powdered" from the Netherlands, Germany, Austria, Belgium, Luxembourg, and Denmark.  J.A. 127.  USDA data also reflect that between 2010 to 2020, cheese in that category was imported into the United States from Switzerland, France, the Netherlands, Germany, Egypt, Denmark, Austria, Belgium, Ireland, the Czech Republic, Italy, and Tunisia.  While the record does not demonstrate how much of this cheese has been sold and labeled as gruyere in the United States, sales records show that, at a minimum, certain companies sold approximately █████ pounds of German-produced cheese as gruyere in the United States in 2020 alone.

---

[2] It is not clear from the record in what unit of measurement the Glanbia sales are recorded.  However, consistent with the parties' briefing, we assume the sales are recorded in pounds.

B.

Seeking to curtail the indiscriminate labeling of cheese as gruyere in the United States, IDG applied to the USPTO in 2010 to register "LE GRUYERE" as a certification mark that would certify that the cheese originates in the Gruyère region of Switzerland. The USPTO refused registration of the applied-for mark because it found that "the relevant consuming public views gruyere as a firm, nutty flavored cheese that can be made anywhere. Therefore, gruyere is a generic designation for cheese." J.A. 647. IDG also applied for another certification mark in 2010. This mark would similarly certify that the cheese originates in the Gruyère region of Switzerland, but unlike the previously applied-for mark, this application did not only attempt to certify the words "LE GRUYERE." Rather, IDG applied to register a mark that "consists of the term 'LE GRUYÈRE SWITZERLAND' in a stylized font. The term 'Switzerland' appears within a solid bar directly under 'LE GRUYÈRE.' To the right appears a stylized square containing the letters 'AOC' and a stylized Swiss cross." J.A. 928. The USPTO granted registration of this requested certification mark in 2013. As a result, only cheese that originates in the Gruyère region of Switzerland can bear the following certification mark:



J.A. 928.

In addition to its efforts with the USPTO, IDG engaged in a letter-writing campaign asking retailers and manufacturers in the United States to stop labeling their non-Swiss

cheeses as gruyere.  While some retailers and manufacturers crumbled under IDG's pressure, numerous others declined IDG's request and continued labeling their cheese as gruyere.

C.

On September 17, 2015, the Consortiums filed another application with the USPTO. In this application, the Consortiums sought to register the word "GRUYERE" as a certification mark.  The certification mark would "certif[y] that the cheese originates in the Gruyère region of Switzerland and France," J.A. 383, and would preclude any cheese produced outside that region from using the "GRUYERE" label.  The USPTO published the mark for opposition, and the Opposers filed Notices of Opposition.[3]  The Opposers alleged that (1) the Consortiums failed to exercise legitimate control over the proposed certification mark, which prevents it from functioning as a certification mark; and (2) because gruyere is a generic name for cheese, it is unregistrable under the Trademark Act. As to the latter argument, a generic term is one that members of the relevant public understand as identifying the type, rather than the source, of a product.  *In re Steelbuilding.com*, 415 F.3d 1293, 1296 (Fed. Cir. 2005).  According to the Opposers, cheese consumers in the United States understand "GRUYERE" as identifying a type of cheese, rather than as a signifier that the cheese was produced in the Gruyère region of Switzerland and France.

---

[3] In addition to the three Appellees in this case, the International Dairy Foods Association also filed a notice of opposition.  However, the TTAB dismissed that party for lack of standing.

The parties each submitted evidence to the TTAB.  Following a trial, the TTAB issued a decision in favor of the Opposers.  Based on its review of the evidence, the TTAB determined that the term "GRUYERE" is generic because "purchasers and consumers of cheese understand the term 'gruyere' as a designation that primarily refers to a category within the genus of cheese that can come from anywhere."  J.A. 77.  The TTAB declined to reach the Opposers' control argument.

D.

Pursuant to 15 U.S.C. § 1071(b), on October 6, 2020, the Consortiums filed a complaint in the United States District Court for the Eastern District of Virginia challenging the TTAB's decision.  Based on their allegations of error in the TTAB's decision, they requested the district court reverse the TTAB's decision and order the USPTO to register their certification mark.  The parties undertook additional discovery, after which the Opposers moved for summary judgment.  The Opposers again argued that the term "GRUYERE" is ineligible for certification mark registration because it is generic, and because the Consortiums had not controlled the term in the United States.

The district court granted the Opposers' motion, finding that "the factual record in this case points indisputably to the conclusion that cheese purchasers in the United States understand the term GRUYERE to refer to a generic type of cheese without reference to the geographic location where the cheese is produced." *Interprofession Du Gruyère v. U.S. Dairy Exp. Council*, 575 F. Supp. 3d 627, 638, 649 (E.D. Va. 2021).  In so doing, the district court considered three categories of record evidence.  First, the court found that the FDA standard of identity for "Gruyere cheese" indicates the mark is generic. *Id.* at 640–

41.  Second, the district court held that the USDA import data and related evidence, as well as evidence of domestically produced gruyere-labeled cheese, also favor a finding that the term is generic.  *Id.* at 641–47.  Third, the district court determined that evidence of common usage of the term gruyere supports the same conclusion.  *Id.* at 647–49.  Having concluded that the sought-after certification mark is ineligible for registration because it is generic, the court declined to reach the Opposers' control argument.  *Id.* at 631 n.1.

The Consortiums timely appealed the district court's decision to this Court.

## II.

We review "a district court's grant of summary judgment *de novo*, applying the same standards employed by the district court." *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 522 (4th Cir. 2002).  "Summary judgment is proper when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(c)).  "In evaluating a motion for summary judgment, the court views the record in the light most favorable to the nonmoving party."  *Id.*  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).

9

III.

A.

We begin with an overview of the legal framework governing this appeal.  The central dispute in this case is whether the district court properly granted summary judgment for the Opposers on the ground that the Consortiums' proposed certification mark is generic.  A certification mark is "any word, name, symbol, or device, or any combination thereof" that is used "to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization."  15 U.S.C. § 1127.  Unlike a typical trademark, "[a] geographic certification mark is not used by the owner of the mark; rather, the owner of the certification mark controls how others use the mark."  *Luxco, Inc. v. Consejo Regulador Del Tequila, A.C.*, 121 U.S.P.Q.2d 1477 (T.T.A.B. 2017).  Certification mark "users apply the mark to the goods to indicate to consumers that the goods have been certified as meeting the standards set forth by the certifier (*i.e.*, the owner of the mark)."  *Id.*

"[C]ertification marks, including indications of regional origin" are registrable "in the same manner and with the same effect as are trademarks."  15 U.S.C. § 1054.  Therefore, as is the case with trademark registration, "[a] generic name—the name of a class of products or services—is ineligible" for registration as a certification mark.  *USPTO v. Booking.com B. V.*, 140 S. Ct. 2298, 2301 (2020).  "A generic term, by definition, identifies a type of product, not the source of the product."  *Steelbuilding.com*, 415 F.3d at 1296.  And even if a term was once non-generic, the term can become generic when it

10

"ceases to identify in the public's mind the particular source of a product or service but rather identifies a class of product or service, regardless of source." *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996). Pursuant to the Lanham Act, "[t]he primary significance of the registered mark to the relevant public . . . shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used." 15 U.S.C. § 1064(3). In other words, "[t]he critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *H. Marvin Ginn Corp. v. Int'l Assn. of Fire Chiefs, Inc.*, 782 F.2d 987, 989–90 (Fed. Cir. 1986).[4] Moreover, "a term is generic if the relevant public understands the term to refer to part of the claimed genus of goods or services, even if the public does not understand the term to refer to the broad genus as a whole." *In re Cordua Rests., Inc.*, 823 F.3d 594, 605 (Fed. Cir. 2016).

The TTAB determined, and the parties do not dispute, that the genus of goods is "cheese" and "the relevant public consists of members of the general public who purchase or consume cheese." J.A. 41. Therefore, this appeal hinges on whether members of the

---

[4] According to the Consortiums, this test asks how the majority of consumers views the term in question. The Consortiums cite to J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12.6 (5th ed. 2022), which states that when "some people regard the contested designation as a generic name, while others regard it as a mark, . . . majority usage controls." Accordingly, to the extent the evidence shows that the term "GRUYERE" has a different meaning to different consumers, we would look to the majority usage. But we are not otherwise obligated to specifically discern the majority usage of a term to determine whether a term is generic. Such a requirement would seem to necessitate a consumer survey in all cases, which, for the reasons discussed *infra*, is not the law.

general public who purchase or consume cheese primarily understand the term "GRUYERE" as referring to a type of cheese, rather than as indicating that the cheese was produced in the Gruyère region of Switzerland and France. "Evidence of what the relevant public understands the term to mean may come from direct consumer testimony, surveys, dictionary listings, newspapers, and other publications." *Loglan Inst., Inc. v. Logical Language Grp., Inc.*, 962 F.2d 1038, 1041 (Fed. Cir. 1992).

The opposer of the mark "bears the burden of proving generic-ness by a preponderance of the evidence." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 965 (Fed. Cir. 2015). And, while whether a term is generic is a factual issue, this Court has recognized that summary judgment is appropriate in genericness cases when the evidence "is so one-sided that one party must prevail as a matter of law." *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 542 (4th Cir. 2004) (quoting *Liberty Lobby*, 477 U.S. at 251–52).

## B.

The Consortiums posit that, in granting summary judgment for the Opposers, the district court made numerous errors in its assessment of the record. Specifically, the Consortiums contend that the district court's analysis was flawed with respect to three categories of evidence: (1) the FDA standard of identity; (2) the prevalence of imported gruyere cheese from countries other than Switzerland and France, as well as domestically produced gruyere cheese, in the United States market; and (3) the common usage of the term gruyere. We assess each category in turn and conclude that the district court did erroneously make certain inferences in favor of the Opposers in its analysis of categories

12

two and three.  However, considering the evidence absent such inferences, we nevertheless conclude that the term "GRUYERE" is generic as a matter of law.

1.

In its summary judgment opinion, the district court relied on the FDA standard of identity for "Gruyere cheese," which describes gruyere as a cheese containing "small holes or eyes," "a mild flavor, due in part to the growth of surface-curing agents," that is aged a minimum of ninety days, and has a "minimum milkfat content [of] 45 percent by weight of the solids and [a] maximum moisture content [of] 39 percent by weight."  21 C.F.R. § 133.149.  Because the standard of identity does not contain any geographic restrictions on where the cheese can be produced, the district court concluded that the standard of identity supports a finding that the term "GRUYERE" is generic.  In further support of this conclusion, the district court cited the USPTO's Trademark Examination Guide for "Marks Including Geographic Wording that Does Not Indicate Geographic Origin of Cheeses and Processed Meats" ("USPTO Guide").  The USPTO Guide states that cheese or meat names for which the FDA or USDA prescribes a standard of identity "cannot be single source indicators, and inclusion on [standard of identity] lists is strong evidence that the otherwise geo-significant wording is generic for the goods."  J.A. 1500.  According to the USPTO Guide, "[b]ecause standards of identity relate solely to production methods and ingredients, there is no requirement that the product come from a specific place. . . .  Therefore, such geo-significant terms differ from certification and collective marks of regional origin, which are registrable under . . . 15 U.S.C. § 1054."  J.A. 1500–01.  Recognizing that the USPTO Guide does "not have the force and effect of law and [is] not meant to bind the

13

public in any way," J.A. 1500, the court accorded it deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

The Consortiums contend that this aspect of the district court's opinion is in error for two primary reasons. First, they argue that the district court improperly relied on the USPTO Guide which, they allege, applies to trademarks but not certification marks. Second, the Consortiums argue that the FDA cannot "permit" labeling of cheese as "GRUYERE," because "[w]hether a cheese maker is 'permitted' to use the name 'GRUY[E]RE' is a matter for trademark law, not FDA law." Opening Br. 34. Neither argument is availing.

a.

As to their first argument, the Consortiums posit that the USPTO Guide applies only to trademarks—not certification marks—and, therefore, the district court erred in giving *Skidmore* deference to guidance they contend is irrelevant. The USPTO Guide explains that "[b]ecause standards of identity relate solely to production methods and ingredients, there is no requirement that the product come from a specific place, even though many of these terms identify a cheese or processed meat that once came only from the place referred to in the name. . . . *Therefore, such geo-significant terms differ from certification and collective marks of regional origin*, which are registrable under . . . 15 U.S.C. § 1054." J.A. 1500–01 (emphasis added). According to the Consortiums, this language indicates that the USPTO Guide does not apply to certification marks.

But we do not read this language as placing certification marks beyond the USPTO Guide's reach. Rather, we read it as emphasizing that cheeses for which there is an FDA

14

standard of identity tend not to be registrable as a certification mark of regional origin. Further, as the Opposers point out, it would not make sense for the USPTO Guide to apply to trademarks but not certification marks, as certification marks are registrable "in the same manner and with the same effect as are trademarks." 15 U.S.C. § 1054. Therefore, to the extent that guidance informs the genericness inquiry for trademarks, so too, does it inform the genericness inquiry for certification marks.[5]

Regardless of the relevance of the USPTO Guide, we believe the FDA standard of identity for "Gruyere cheese" is evidence that the term "GRUYERE" is generic. To start, while consumers may not be aware of specific FDA regulations, as the TTAB recognized, "consumers are affected by the regulations because they govern the labels that consumers see in stores, advertising and on webpages." J.A. 74. Indeed, as we have recognized in a different context, a "standard of identity . . . ensure[s] that certain foods accord with consumer expectations." *Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 621 (4th Cir. 2015) (holding that the Nutrition Labeling and Education Act and the Federal Food, Drug, and Cosmetic Act ("FDCA") preempted plaintiff's state-law claims). And because the FDA standard of identity for "Gruyere cheese" has set constraints for labeling products as gruyere since 1977, it follows that its requirements—which do not prescribe any

---

[5] As a fallback argument, the Consortiums contend that the district court erred in giving *Skidmore* deference to the USPTO Guide because it does not provide guidance on a matter within the USPTO's expertise. But determining whether a term is generic and, in turn, ineligible for certification mark registration, is squarely within the USPTO's expertise. Regardless, we need not consider the appropriate level of deference to accord the USPTO Guide because, as we discuss, we do not have to rely on it to conclude that the FDA standard of identity supports treating the term "GRUYERE" as generic.

15

limitations on where the cheese must be produced—accord with consumer expectations about the gruyere label.

In addition, the Federal Circuit, with its "'extensive expertise' in the area of trademark law," *Snyder's-Lance, Inc. v. Frito-Lay North Am., Inc.*, 991 F.3d 512, 528 (4th Cir. 2021), has similarly relied on an agency regulation to determine that a term is generic. In *Institut National Des Appellations D'Origine v. Vintners International Co.*, the court considered an application to register the trademark "CHABLIS WITH A TWIST" for a wine product.   958 F.2d 1574, 1576 (Fed. Cir. 1992).    The Institut National Des Appellations D'Origine opposed, arguing that the trademark is geographically deceptive because "Chablis" is a name of geographic significance that refers to Chablis, France.  *Id.* at 1580.  In rejecting this argument, the Federal Circuit noted that the Bureau of Alcohol, Tobacco and Firearms regulations, which "define 'Chablis' as a 'semi-generic' term which is a name of geographic significance and also the designation of a class or type of wine," "lend support to the argument that the term is generic."  *Id.* at 1582.  *See also Luxco, Inc.*, 121 U.S.P.Q.2d 1477 (noting that Alcohol and Tobacco Tax and Trade Bureau "regulations are probative in determining whether a term is distinctive or generic.").  We follow that approach and conclude that the FDA standard of identity for "Gruyere cheese," which does not link the production of the cheese to any geographic region, is evidence that the term "GRUYERE" is generic.

b.

In support of their second argument—that the FDA cannot "permit" labeling of cheese as gruyere—the Consortiums rely on *POM Wonderful LLC v. Coca-Cola Co.*,

wherein the Supreme Court held that compliance with Federal FDCA and FDA labeling regulations did not preclude a private cause of action under the Lanham Act. 573 U.S. 102, 120–21 (2014). The Consortiums posit that *POM Wonderful* establishes that an FDA standard of identity cannot preclude registration of the term "GRUYERE" as a certification mark. The Consortiums also note that other cheese products, such as Roquefort and Reggiano, are the subject of both an FDA standard of identity and a protected certification mark. *See* 21 C.F.R. § 133.184 (standard of identity for "Roquefort cheese, sheep's milk blue-mold, and blue-mold cheese from sheep's milk"); ROQUEFORT, Registration No. 571,798 (certification mark for ROQUEFORT); *see also* 21 C.F.R. § 133.165 (standard of identity for "Parmesan and reggiano cheese"); REGGIANO, Registration No. 3,438,648 (certification mark for REGGIANO).

To the extent these arguments serve to demonstrate that the FDA standard of identity for "Gruyere cheese" cannot, on its own, preclude registration of the "GRUYERE" certification mark, we agree. But the district court did not hold that the FDA standard of identity for the term "Gruyere cheese" prevents its registration as a certification mark. Rather, the court found that "the FDA's standard of identity for GRUYERE *presents strong evidence* that GRUYERE is a generic term," *Interprofession Du Gruyère*, 575 F. Supp. 3d at 641 (emphasis added), which the Consortiums' contentions do not undermine. That is, *POM Wonderful* holds only that the FDCA does not preclude Lanham Act claims challenging food and beverage labels. 57 U.S. at 120–21. The decision does not bear on whether the USPTO or courts can look to FDCA or FDA regulations as evidence in trademark or certification mark disputes.

Similarly, that certain cheeses are subject to both an FDA standard of identity and a certification mark demonstrates only that FDA standards of identity should not be used as conclusive evidence of genericness, not that standards of identity are irrelevant to the genericness inquiry. And in any event, the Consortiums' examples are distinguishable. Unlike the standard of identity set forth in 21 C.F.R. § 133.149, which is titled "Gruyere cheese," the FDA standard of identity for Roquefort cheese is not limited to one label. Rather, it is titled "Roquefort cheese, sheep's milk blue-mold, and blue-mold cheese from sheep's milk." 21 C.F.R. § 133.184. Similarly, the standard of identity for Reggiano cheese has the dual title "Parmesan and reggiano cheese." 21 C.F.R. § 133.165. Therefore, even though Roquefort and Reggiano cheese may not be generic, their respective FDA standards of identity prescribe production and ingredient requirements for alternative (and, ostensibly, generic) names for those cheeses. It thus makes sense why an FDA standard of identity—which does not require cheese to be produced in any location—exists for those types of cheese which have both generic and non-generic labels. By contrast, the FDA standard of identity for "Gruyere cheese" does not recognize alternative names for the cheese, suggesting that consumers understand the "Gruyere cheese" label as indicating a type of cheese, rather than as indicating that the cheese comes from a particular source.

We therefore agree with the district court's conclusion that the FDA standard of identity for "Gruyere cheese" supports a finding that the term "GRUYERE" is generic.

2.

Next, the Consortiums contend that the district court drew erroneous inferences regarding gruyere-labeled cheese in the United States market that is imported from

18

countries other than Switzerland and France and produced domestically.  We conclude that
while the district court made an improper inference in the Opposers' favor regarding the
USDA import data, the evidence of imported and domestic gruyere cheese, too, favors a
finding that "GRUYERE" is generic.

a.

First, the district court concluded, based on the USDA import data, that "from 2010-
2020, the majority of GRUYERE-labeled cheese imported into the United States was
imported from the Netherlands and Germany, not from Switzerland or France."
*Interprofession Du Gruyère*, 575 F. Supp. 3d at 641.   The district court rejected the
Consortiums' argument that there is no evidence the cheese in the USDA table was sold to
the public labeled as gruyere.  In so doing, the court cited the undisputed evidence that, in
2020, Boar's Head and Dietz & Watson collectively sold approximately ████ pounds
of German-produced cheese labeled as gruyere.

The Consortiums now contend that the district court improperly inferred from the
USDA table that the majority of gruyere-labeled cheese imported into the United States
was imported from countries other than Switzerland and France.  The Consortiums reiterate
their concern that the record does not demonstrate how the cheese in the USDA table was
labeled and point out that the table itself only refers to cheese imported into the United
States under the "Gruyere-Process Cheese, Processed, Not Grated or Powdered" tariff
category.  The Consortiums further argue that the only concrete evidence of sales of non-
Swiss or French imported cheese—the sales of ████ pounds of German-produced
gruyere-labeled cheese in 2020—pales in comparison to the amount of gruyere cheese

19

imported from Switzerland that same year.  In support of this assertion, they cite a table stating that Switzerland exported approximately seven million pounds of gruyere cheese to the United States in 2020.

We agree with the Consortiums that, to the extent the district court relied on the USDA table to conclude that the majority of gruyere-labeled cheese imported into the United States was from countries other than Switzerland and France, it erred.  While evidence in the record shows significant sales of non-Swiss and non-French imported cheese labeled as gruyere in the United States, that evidence does not demonstrate that *all* of the cheese reflected in the USDA table was sold as gruyere in the United States.  In fact, some of the concrete evidence in the record conflicts with the numbers in the USDA table.  For example, whereas the USDA table reflects that Switzerland exported 292,035 pounds of cheese in the "Gruyere-Process Cheese, Processed, Not Grated or Powdered" category in 2020, the Consortiums submitted evidence that, in the same year, Switzerland exported seven million pounds of gruyere cheese to the United States.

Given the lack of concrete evidence demonstrating that the cheese reflected in the USDA table was sold to consumers in the United States as gruyere and the conflicts between the USDA data and other evidence in the record, the district court's conclusion that the majority of imported gruyere-labeled cheese did not come from Switzerland and France constitutes an inference in favor of the Opposers, the party moving for summary judgment.  Such an inference is plainly impermissible at this stage.  *See Lone Star*, 43 F.3d at 928.

20

However, the district court correctly concluded from the record evidence that the Opposers had "clearly demonstrated that hundreds of thousands of pounds of cheese produced outside the Gruyère region of Switzerland and France is imported into the United States and sold in the United States labeled as GRUYERE." *Interprofession Du Gruyère*, 575 F. Supp. 3d at 644. As discussed, the Opposers submitted records from Boar's Head and Dietz & Watson demonstrating the sale of ███████ pounds of German-produced, gruyere-labeled cheese in the United States in 2020. Appellant IDG also wrote a letter to Finlandia, a cheese company selling Finland-produced cheese, requesting that it stop labeling its cheese as "Imported All Natural GRUYERE Cheese," J.A. 198, which indicates that other companies, in addition to Boar's Head and Dietz & Watson, have sold imported cheese from non-Swiss and non-French companies labeled as gruyere in the United States. The undisputed evidence thus establishes that a substantial quantity of cheese has been imported to the United States from countries other than Switzerland and France and sold to consumers as gruyere.

### b.

Second, the Consortiums mount a similar attack against the district court's consideration of the quantities of gruyere-labeled cheese produced in the United States. The district court relied on sales records for Emmi Roth's private label cheese to find that the Opposers "provided undisputed evidence that millions of pounds of domestic-produced cheese are sold as GRUYERE." *Interprofession Du Gruyère*, 575 F. Supp. 3d at 644. The district court dismissed the Consortiums' argument that not all of Emmi Roth's private label cheese is sold and labeled as gruyere because the Opposers had introduced sales data

demonstrating that in 2020, Wegmans and Boar's Head sold a combined ███ pounds of Emmi Roth's private-label cheese, which they labeled as gruyere.  The district court also cited evidence that Glanbia domestically produced and sold over ███ pounds of cheese labeled as gruyere in 2020, as well as evidence of labels from other smaller domestic cheesemakers which have sold cheese as gruyere in the United States.

The Consortiums contend that this assessment was in error for two reasons.  First, they reiterate their argument that there is no evidence indicating that all of Emmi Roth's private label cheese is resold as gruyere.  Second, the Consortiums dispute the district court's reliance on Glanbia's sales because the only label Glanbia provided in discovery was a label for wholesale cheese sales.

As to the Consortiums' first argument, they are correct that the evidence does not establish that all of Emmi Roth's private label customers label and sell the cheese as gruyere.  But the record does show that in 2020, Emmi Roth sold over ███ pounds of private label cheese, of which private label customers resold, at the very least, ███ pounds as gruyere.  Moreover, an Emmi Roth corporate representative provided deposition testimony that "the majority of private label that's being done are calling it Gruyère," J.A. 1833, indicating that the quantity of Emmi Roth cheese resold as gruyere in 2020 exceeded ███ pounds.  The Consortiums attempt to cast doubt on this evidence by arguing that some supermarkets call the private label cheese "Alpine style cheese," or "Mountain Style," and by asserting that some of this private label cheese is sold to "food service customers, which likely use no labels."  Opening Br. 43.  But these arguments are a red herring; even if, as the Consortiums contend, some portion of the private label sales was

not labeled as gruyere (or was not labeled at all), the undisputed evidence just discussed confirms the district court's conclusion that "a substantial volume of Emmi Roth's private label cheese is, in fact, relabeled and sold [to consumers] as GRUYERE." *Interprofession Du Gruyère*, 575 F. Supp. 3d at 644–45.

The Consortiums' challenge to the district court's assessment of the Glanbia data is similarly unavailing. It is true that the label for Glanbia cheese in the record is for a forty-pound quantity of cheese and is, therefore, likely a wholesale label. But, in determining whether a term is generic, the Lanham Act directs us to determine "[t]he primary significance of the registered mark to the *relevant public*." 15 U.S.C. § 1064(3) (emphasis added). As the Sixth Circuit has recognized, "'[t]he relevant public' is a broad term that implies that in an appropriate case it could include professional buyers." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 406 (6th Cir. 2002) (citation omitted). This is such an appropriate case. The relevant public "consists of members of the general public who purchase or consume cheese," J.A. 41, which undoubtedly includes purchasers of wholesale cheese. The district court thus properly relied on the evidence of Glanbia sales in concluding that millions of pounds of domestic-produced cheese are sold as gruyere in the United States.

We note that, in addition to the sales of gruyere-labeled Emmi Roth private label cheese and Glanbia cheese—which, together, totaled approximately ████████ pounds in 2020—there is also undisputed evidence in the record that numerous other cheese companies and retailers have labeled their domestically produced cheese as gruyere. Indeed, IDG wrote letters to Red Apple Cheese, Burnett Dairy, Trader Joes, and Dairy

Food USA, among others, demanding that they cease labeling their United States-produced cheese as gruyere.  This evidence suggests that the quantity of domestically produced cheese labeled as gruyere exceeded ███████ pounds in 2020.

*    *    *

All told, the record reflects sales in 2020 of at least ██████ pounds of gruyere-labeled cheese that was produced outside of the Gruyère region of Switzerland and France. In *In Re Cooperativa Produttori Latte E Fontina Valle D'acosta*, the TTAB concluded that the term fontina "merely describes or is the generic name for a type of cheese," in part because "the record reveal[ed] that there is a *domestic* fontina cheese." 230 U.S.P.Q. 131 (T.T.A.B. Mar. 19, 1986).  Here too, the evidence demonstrates the existence of a domestic gruyere cheese.  And even more persuasively, the record establishes that, at least in 2020, non-Swiss and non-French cheese made up a substantial portion of the cheese sold as gruyere in the United States market.  "This evidence is probative of generic use because the more members of the public see a term used by competitors in the field, the less likely they will be to identify the term with one particular producer" (or, in this case, one geographic region).  *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 706 (1st Cir. 2007) (cleaned up).  And significantly, Wegmans—which sells both domestic and Swiss-produced gruyere cheese—sold more domestic gruyere-labeled cheese than Swiss gruyere-labeled cheese each year between 2016 and 2021 (except 2020).  This evidence strongly indicates that "to the American purchaser, [GRUYERE] primarily signifies a type

24

of cheese (much like brie, swiss, parmesan or mozzarella) regardless of regional origin, rather than a mark of certification." *Id.*[6]

3.

Finally, the Consortiums challenge the district court's consideration of evidence of common usage of the term gruyere. Specifically, they contend that the district court erroneously concluded that two groups of evidence—(1) dictionary definitions of the term gruyere; and (2) references to gruyere in the media—support a finding that the term "GRUYERE" is generic.[7] For the following reasons, we agree with the Consortiums that the dictionary definition evidence here is not probative of genericness but conclude that the media references support a finding that "GRUYERE" is generic.

a.

First, the district court considered various definitions of "Gruyère" and "Gruyère cheese" which the parties submitted in support of their respective positions. Some of the definitions in the record reference production in Switzerland and/or France:

- "Gruyère, hard cow's-milk cheese produced in the vicinity of La Gruyère in southern Switzerland and in the Alpine Comté and Savoie regions of eastern France." J.A. 1759 (*Encyclopaedia Brittanica*, "Gruyère").

---

[6] In their reply brief, the Consortiums raise the additional argument that the district court erred by finding that certain labels prominently display the cheese's Wisconsin origins. We decline to reach this argument because "an issue first argued in a reply brief is not properly before a court of appeals." *Cavallo v. Star Enterprise*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996).

[7] The district court also considered evidence relating to cheese competitions in this section. Because the Consortiums do not appear to contest this aspect of the district court's analysis, and it does not impact our conclusion, we do not address it herein.

- "[A] firm cheese with small holes and a nutty flavor that is of Swiss origin"; "a process cheese made from natural Gruyère."  J.A. 1761 (*Merriam-Webster.com*, "Gruyère").

- "A kind of cheese made at Gruyère, Switzerland."  J.A. 1763 (*The Free Dictionary*, "Gruyère cheese").

- "Gruyère is an appellation de contrôlée (AOP) cheese from Switzerland and a family of mountain cheeses, all made from cow's milk and all large, cooked-curd, pressed, and aged."  J.A. 1771 (*Oxford Companion to Cheese*, "Gruyère").

Other definitions do not contain such a reference:

- "A firm, tangy cheese."  J.A. 42, 1777 (*oxforddictionaries.com*, "Gruyère").

- "[A] pressed whole-milk cheese of a pale yellow color and nutty flavor and usually with small holes"; "a process cheese made in small forms and wrapped in foil."  J.A. 42–43, 692 (*Merriam-Webster.com*, "Gruyère cheese").

- "A nutty, pale yellow, firm cheese made from cow's milk."  J.A. 42, 652 (*American Heritage Dictionary of the English Language*, "Gruyère").

The district court considered most, but not all, of the definitions in the record and concluded that "[v]iewed as a whole, the dictionary evidence points to the conclusion that the term GRUYERE is not restricted to cheese produced in the [Gruyère] region of Switzerland and France."  *Interprofession Du Gruyère*, 575 F. Supp. 3d at 647.  The Consortiums point to the various dictionary definitions defining "Gruyère" or "Gruyère cheese" as being produced or originating in Switzerland and/or France to argue that the dictionary evidence does not support a finding of genericness.  Recognizing the numerous dictionary definitions which define "Gruyère" or "Gruyère cheese" without reference to any geographic region, we cannot conclude that the dictionary evidence indicates that cheese consumers primarily understand the term "GRUYERE" to refer to cheese that is produced in the Gruyère region of Switzerland and France.  However, given the conflicting

26

dictionary definitions, the district court erred insofar as it concluded that the definitions support a finding that the term is generic.

b.

Next, the district court considered references to gruyere in publications, articles, and other online media.  For example, the record contains downloads from websites that include "Gruyere" on a list of "Wisconsin Cheese Traits," J.A. 1046–48; that sell gruyere that is domestic and imported from Austria; and that rank "Wisconsin Gruyere Cheese," "Austrian Alps Gruyere," and an "Italian Gruyere" cheese on a list of the "10 Best Gruyere Cheese Options," J.A. 1076–79.  The record also contains recipes referring to "Wisconsin Gruyère" in their title, such as "Bacon Mac & Cheese with Wisconsin Gruyère," J.A. 1051, "Green Bean and Wisconsin Gruyère Casserole with Spicy Onion Rings," J.A. 1054, and "Ham & Wisconsin Gruyère Spirals," J.A. 1057.  Additionally, the district court noted that the Opposers had introduced numerous press articles that referred to gruyere without referencing production in Switzerland or France.  The district court concluded that because of this substantial evidence, together with the fact that the Consortiums only offered "two online-dictionary definitions (discussed previously), one printout from Wikipedia, and one European cheese guide," the weight of the common usage evidence favors a finding of genericness. *Interprofession Du Gruyère*, 575 F. Supp. 3d at 648.

The Consortiums contest the district court's conclusion on two grounds, but neither holds water.  First, the Consortiums contend that some of the common usage evidence does not reflect the public's current perception, as it refers to Roth's Wisconsin "Gruyere," which was changed to "Grand Cru" in 2013.  But regardless of when the website postings

27

were published, the record demonstrates that the Opposers downloaded each of these webpages in 2021.  That is, the webpages were accessible to—and continued to inform—the relevant public at the time of the summary judgment proceedings.  Therefore, the "articles constitute[] evidence that the [cheese-consuming] public understands the term [GRUYERE] to refer to a type of [cheese]."  *Cordua Rests.*, 823 F.3d at 604.

Second, the Consortiums posit that references to gruyere in recipes and menus that lack any mention of geographic origin do not show genericness.  In support, the Consortiums cite *Luxco Inc.*, wherein the TTAB held that recipes referencing "Tequila" without indicating its geographic origin did "not show that consumers are unaware of the geographic origin of Tequila." 121 U.S.P.Q.2d 1477.  We note that other courts have found that references to a term, without mention of who sells or manufactures it, indicate that the term is generic.  *See Colt Def.*, 486 F.3d at 706 (finding that articles which "refer to the M4 as a type of carbine with certain characteristics, not a brand of carbine sold by a certain producer" support a determination that the term "M4" is generic); *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989) ("[E]vidence . . . of newspaper and magazine use of the phrase Murphy bed to describe generally a type of bed . . . is a strong indication of the general public's perception that Murphy bed connotes something other than a bed manufactured by the Murphy Co.").  But even accepting the Consortiums' argument, the Opposers offered evidence of numerous websites specifically describing gruyere as originating in places *other than* Switzerland and France, including Wisconsin and Austria, which supports a finding that the primary significance of the term to the relevant public is a type of cheese that can be produced anywhere.

28

Therefore, notwithstanding the neutral nature of the dictionary evidence, we conclude that the evidence of the common usage of gruyere favors a finding that the term is generic.

\*     \*     \*

Having addressed the Consortiums' challenges to the district court's opinion, we conclude that, while the district court made certain improper inferences in its analysis, the record nevertheless contains evidence that is "so one-sided" that there is no genuine issue as to any material fact and Opposers must prevail as a matter of law. *Retail Servs., Inc.*, 364 F.3d at 542. The FDA standard of identity, the pervasive sales of non-Swiss and non-French cheese labeled as gruyere in the United States, and the common usage of gruyere "establish[] that when purchasers walk into retail stores and ask for [gruyere], they regularly mean" a type of cheese, and not a cheese that was produced in the Gruyère region of Switzerland and France. *Glover*, 74 F.3d at 59.

## C.

The Consortiums attempt to overcome this overwhelming evidence by arguing that the district court could not have properly granted summary judgment where, as here, the Opposers failed to provide consumer survey evidence. This argument slices the cheese too thinly. It is true that survey evidence has become "almost de rigueur in litigation over genericness," *Convenient Food Mart, Inc. v. 6-Twelve Convenient Mart, Inc.*, 690 F. Supp. 1457, 1461 (D. Md. 1988) (cleaned up), but parties are "not required to provide direct evidence of consumer perception to support [their] genericness challenge[s] to [trademarks or certification marks]," *Royal Crown Co., Inc. v. The Coca-Cola Co.*, 892 F.3d 1358, 1370

29

(Fed. Cir. 2018).  Indeed, "[e]vidence of the public's understanding of the mark may be obtained from *any competent source*, such as consumer surveys, dictionaries, newspapers and other publications."  *Cordua Rests.*, 823 F.3d at 599 (emphasis added) (internal quotation marks and citation omitted); *see also Glover*, 74 F.3d at 59 (noting that evidence that a mark has become generic "may come from purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications.").

Along similar lines, the Consortiums contend that summary judgment is improper in all cases where a term that was not "commonly used prior to its association with the products at issue" allegedly becomes generic over time.  Reply Br. 26 (quotation omitted).  As a threshold matter, the Consortiums have not brought evidence bearing on whether, at an earlier point in history, the term "GRUYERE" was in common use in the United States.  But even assuming that was the case, this argument still fails.  While "difficult questions may be presented when a term has . . . a meaning that has changed over time," *Booking.com B.V.*, 140 S. Ct. at 2307, the Consortiums point to no case where we have categorically held that those difficult questions cannot be resolved at summary judgment.  And the various cases concluding at summary judgment that a term not previously in common use has become generic dissuade us from adopting such a categorical rule now.  *See, e.g.*, *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1570–71 (Fed. Cir. 1995) (affirming finding, on summary judgment, that a "Walking Fingers" logo had "become generic"); *Van Well Nursery, Inc. v. Mony Life Ins. Co.*, 421 F. Supp. 2d 1321, 1332 (E.D. Wash. 2006) (concluding, on summary judgment, that "Scarlet Spur" and "Smoothee" had become generic terms for a variety of apple trees); *CVP Sys., Inc. v. M-Tek Inc.*, No. 92 C 5761,

1994 WL 531556, at *7 (N.D. Ill. Sept. 29, 1994) (concluding, on summary judgment, that "CVP" had become a generic term for packaging machines for the poultry industry); *cf. Institut Nat. des Appellations D'Origine*, 958 F.2d at 1582 (affirming finding, on summary judgment, that the term "Chablis" is generic).[8]

In sum, the Consortiums cannot overcome what the record makes clear: cheese consumers in the United States understand "GRUYERE" to refer to a type of cheese, which renders the term generic.

## IV.

For the foregoing reasons, we affirm the district court's summary judgment in favor of the Opposers.

*AFFIRMED*

---

[8] The Consortiums also posit that survey evidence is required for a court to determine on summary judgment that a term which was not previously in common use has become generic. We need look no further than the above-listed cases—which did not rely on survey evidence in their analyses—to reject this argument. Indeed, in *BellSouth*, the Federal Circuit explained that "[w]hile consumer surveys may be a preferred method of proving genericness under the proper test of purchaser understanding, we are satisfied that on the facts of this case genericness has been established under that test." 60 F.3d at 1570.

31